**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.**

v.

**SECURITIES AND EXCHANGE COMMISSION, et al., Appellants.**

No. 77–1761.

United States Court of Appeals, District of Columbia Circuit.

Argued June 16, 1978.

Decided April 20, 1979.

Rehearing Denied July 20, 1979.

Harvey L. Pitt, Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Jacob H. Stillman, Principal Asst. Gen. Counsel, Linda W. Jarett and Daniel L. Goelzer, Securities and Exchange Commission, Washington, D. C., were on the brief, for appellants.

Bruce J. Terris, Washington, D. C., with whom Lonnie C. Von Renner, Philip G. Sunderland, Roger S. Foster, and Lois J. Schiffer, Washington, D. C., were on the brief, for appellees.

Daniel R. Ferry and John . E. Rogers, Washington, D. C., were on the brief, for amicus curiae, Southeastern Legal Foundation, urging reversal.

John K. Tabor, Washington, D. C., was on the brief, for amicus curiae, The Business Roundtable, urging reversal.

Ralph J. Temple and James vanR. Springer, Washington, D. C., were on the brief, for amicus curiae, The American Civil Liberties Union Fund of the National Capital Area, urging affirmance.

Lawrence B. Kraus, Gen. Counsel, Chamber of Commerce of the United States, and Stanley T. Kaleczyc, Jr., Director, National Chamber Litigation Center, Washington, D. C., Donald E. Egan, Francis X. Grossi, Jr., Chicago, Ill., were on the brief, for amicus curiae, Chamber of Commerce of the United States, urging reversal.

Before TUTTLE *, United States Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, and McGOWAN and ROBB, Circuit Judges.

Opinion for the court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This appeal, from a District Court order directing the Securities and Exchange Commission (SEC or Commission) to conduct further proceedings incident to a petition for rulemaking, raises issues intersecting three important federal statutory schemes: the Securities Acts, the Administrative Procedure Act (APA), and the National Environmental Policy Act (NEPA). It involves in particular a request made of the Commis-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

sion, and denied by it after seven years of proceedings, to promulgate rules requiring comprehensive disclosures by corporations of their environmental and equal employment policies.

The District Court held that the Commission had acted arbitrarily and capriciously in denying the petition. Because we find the Commission's action sustainable under the scope of judicial review applicable to this case, we reverse.

I

Appellees [1] are organizations dedicated to inducing more responsive attitudes among American corporations towards the problems of environmental degradation and inequality of employment opportunity. To this end they participate in so-called "corporate responsibility campaigns," which typically involve proposals to corporate management and shareholders, demands for disclosure, media campaigns, lobbying, educational efforts and litigation.

Appellees believe that such campaigns have achieved positive results in some cases, but that their usefulness is currently limited by a shortage of information available to stockholders and an imbalance in the information that is distributed. Stockholders receive considerable lobbying by management through annual reports, selective disclosure, image advertising, and other mechanisms involving large corporate expenditures. In contrast, groups such as appellees find it expensive to compile and disseminate information even when managements are cooperative, and often difficult or impossible when managements are not. Institutional investors in particular, so it is claimed, are naturally reluctant to vote against management in the absence of full and balanced information, whatever their position would be if they were fully informed.

Appellees believe that this impediment to corporate responsibility campaigns could be considerably reduced if corporations were forced to disclose comprehensive information about their environmental and equal employment policies. They expect, further, that such disclosure would aid the public in making sound investments and would deter corporations from taking actions likely to result in significant public disapproval. With these goals in mind, appellees naturally turned to the SEC, which is, of course, the agency charged with administering the federal statutes mandating disclosure of corporate information.

On June 7, 1971, appellees petitioned the SEC to promulgate rules requiring corporate disclosure of environmental and equal employment information. These proposed rules were comprehensive in scope. In the words of the District Court,

> The petition . . . proposed that companies which file with the SEC be required to describe with respect to each major activity or product, *inter alia* : (1) the nature and extent (quantified to the extent feasible) of the resulting pollution or injury to natural areas and resources, and (2) the feasibility of, and plans for, correcting the same. The Petition also requested that the SEC require disclosure of whether the registered company has changed company products, projects, production methods, policies, investments or advertising to advance environmental values.

> In the equal employment opportunity area, that Petition requested that each company which makes public claims about its employment of minorities or women be required to include in its SEC filings statistical data by which the facts on this subject of major significance could be tested by interested persons.

1. The original rulemaking petitioners and plaintiffs in the District Court were the Natural Resources Defense Council, Inc. (NRDC), the Project on Corporate Responsibility, Inc., and the Center on Corporate Responsibility, Inc. *See NRDC v. SEC*, 389 F.Supp. 689, 693 (D.D. C.1974) [*NRDC I*]. By order of September 1, 1976, the following additional plaintiffs were joined: the National Organization for Women; the Unitarian Universalist Association; the American Baptist Home Mission Society; and the Province of St. Joseph of the Capuchin Order. *NRDC v. SEC*, 432 F.Supp. 1190, 1197 n. 17 (D.D.C.1977) [*NRDC II*]. All of the foregoing are appellees here.

This employment information would be no more than that information required to be filed by such companies with the Equal Employment Opportunity Commission under existing laws and regulations. The Petition further requested that the SEC modify the definition of "material litigation", for which disclosure is required in SEC forms, so as to include all proceedings against a company under Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e et seq., or under the equal employment regulations covering federal contractors. In that event, the company would be further required to disclose the statistical data detailed above.

*NRDC I, supra,* 389 F.Supp. at 694. As authority for this petition, appellees relied, *inter alia,* on NEPA, 42 U.S.C. § 4321 *et seq.,* which was alleged to support strongly, if not to mandate, SEC environmental disclosure rules, *see* Sonde & Pitt, *Utilizing the Federal Securities Laws to "Clean the Air! Clean the Sky! Wash the Wind!",* 16 Howard L.J. 831 (1971), and on the call by the U.S. Commission on Civil Rights for SEC civil rights disclosure requirements "as a means of stimulating greater concern in civil rights and related areas." Ex. C at 786.

The SEC declined to propose the rules they advocated, while proposing other rules requiring more limited forms of corporate disclosure. Securities Act Release No. 5235 (Feb. 16, 1972), 37 Fed.Reg. 4365 (1972). After a preliminary jurisdictional misstep,[2] appellees commenced this suit in District Court on March 2, 1973, as a challenge to the Commission's failure to propose the rules they sought.

After receiving and analyzing written comments on the Commission's rulemaking proposals in Release No. 5235, the SEC adopted part of the proposed rules in Securities Act Release No. 5386 (April 20, 1973), 38 Fed.Reg. 12100 (1973). The adopted rules required disclosure only of the *material* financial effects of corporate compliance with environmental laws.[3] Appellees thereupon supplemented their suit in District Court with challenges to the proceedings leading to Release No. 5386, and moved for summary judgment. The District Court agreed with appellees' position and held that the SEC's proceedings had been inadequate under the APA and NEPA. *NRDC I, supra.* It remanded with instructions that fuller proceedings be conducted and issued instructions as to the resolution of two key factual issues, 389 F.Supp. at 701–02 (footnote omitted):

> When the SEC reconsiders its rules in accordance with this opinion, it should develop a record and resolve two overriding factual issues. The first is the extent of "ethical investor" interest in the type of information which Plaintiffs have requested. The second issue is what avenues of action are available which ethical investors may pursue and which will tend to eliminate corporate practices that are inimical to the environment and equal employment opportunity.

On remand, the SEC issued Securities Act Release No. 5569 (Feb. 11, 1975, 40 Fed.Reg. 7013 (1975), giving notice of renewed proceedings to fulfill the District Court's instructions. The interest of the public in these proceedings was considerable. In nineteen days of public hearings, fifty-four

---

**2.** The appellees initially sought review in this court of the SEC's refusal to propose the rules they sought. Their petition for review was dismissed on the ground that the Commission's action was not final agency action subject to judicial review. *NRDC v. SEC,* No. 72–1148 (D.C.Cir. Feb. 8, 1973). A later effort to petition this court for review was also dismissed for lack of jurisdiction. *NRDC v. SEC,* No. 73–1591 (D.C.Cir. June 17, 1975).

**3.** Because the SEC did adopt these limited environmental disclosure rules, appellees attempt

to characterize their complaint as a challenge to agency *action,* on the theory that the SEC did not go *far enough,* rather than as a claim based on the SEC's *failure* to act in adopting the particular rules they proposed. We find this theory disingenuous. Appellees do not object to the terms of the rules actually adopted, which the District Court has allowed to remain in effect pending further rulemaking action by the SEC. It is clear that their real grievance is with the Commission's nonadoption of the expanded disclosure rules they requested.

oral presentations were made and three hundred fifty-three written comments received, creating a record over ten thousand pages long. 40 Fed.Reg. 51657–58 (1975). In large measure, the views expressed were polarized as either in favor of, or in opposition to, appellees' proposal. The comments favoring the proposals generally declared that greater disclosure of information by corporations was essential both to sound voting on corporate policies and to informed consideration of corporate financial positions, in light of what the disclosed information would show with respect to environment and equal employment costs, and, generally speaking, the quality of the corporate management.[4] On the other hand, hundreds of corporations submitted comments opposing the disclosure proposals on the ground that the cost of gathering the required information would be inordinately high, that shareholders were not seriously interested in the information, and that the benefits would be small.[5]

4. The tenor of the pro-proposal comments is expressed by the statement of Roger G. Kennedy, Vice President for Financial Affairs of the Ford Foundation, after discussing how his institution's $2 billion in assets were managed, Ex. C at 533–34:

> Our analysts are expected to know and compute the likely economic effects of present litigation and regulation. . . .
>
> As long-term investors, whose positions are large enough to be difficult to trade quickly, we don't want to be surprised by what EPA or a state legislature, or the EEOC, or a class action suit, or even a court might do. We try to perceive early warning signals. We cannot afford to wait until a law suit or a regulatory action is already in the courts. We expect our investment analysts to keep their binoculars on the horizon so that their earnings estimates, discounted to arrive at estimates of present value, may prudently include the probable impact of those social forces which a well-informed citizen might observe to be abroad in the land.
>
> . . .
>
> Obviously, one cannot vote proxies, or talk intelligently with corporate managers, unless one knows something about the facts underlying the issues presented. Those facts change over time. Staying with a problem besetting the assets one owns is old-time investment religion. So we go back to our analysts, year after year, and back to our independent inquiries about corporate practice, in an effort to make our voting and our conversations sensible and current and well-informed.
>
> We have had to do a lot of digging on our own for such information, though we are often joined in digging by like-minded institutions which share our investment methods. We would rejoice if you were to make it easier for us to be informed. We could then know better what to expect of the long-range financial prospects of our stockholdings; we could be better able to act as effective owners. We might even help nudge the managements, which are, after all, the agents of us owners into ways of behaving which will make our holdings more prosperous in the long run.

5. The tenor of these comments is expressed by the statement of a spokesman for the National Association of Manufacturers, Ex. C at 505–09 (footnotes omitted):

> Even if the Commission had authority to require disclosure of such matters, there are many reasons why it should not do so. Three reasons seem paramount to us: first, such disclosure could frustrate the Commission's statutory purposes; second, there is no need for such disclosure; and third, such disclosure imposes too onerous a burden on U.S. corporations.
>
> . . .
>
> Required disclosure of too much detailed information would frustrate the statutory objective of protecting investors by deemphasizing or obscuring crucial information. The logic of arguments for required disclosure of documents dealing with equal employment opportunity would lead to required disclosure of documents on every (1) tax dispute, (2) contract dispute, (3) patent dispute, (4) OSHA claim, (5) customer complaint, etc., involving an issuer. A quagmire of paper would result, from which investors would learn very little, thereby undermining the statutory function of the Commission.
>
> . . .
>
> Several . . . "service organizations" publish reports on "socially responsible business policies and practices" based on their own research. . . .
>
> If such service organizations and specialized reports for "ethical investors" already exist, what need is there for the costly, onerous, detailed disclosure proposed?
>
> . . .
>
> In addition to being unlawful, inadvisable, and unnecessary, the proposed disclosure of socially significant matters would add to the mounting paperwork burden on American business—a burden whose added costs are passed on to the consumer, thus fueling inflation.
>
> . . .

In October, 1975, and May, 1976, the SEC announced that it would not adopt the proposed disclosure rules, and issued lengthy explanatory statements. Securities Act Releases Nos. 5627 (Oct. 16, 1975), 40 Fed.Reg. 51656 (1975), and 5704 (May 6, 1976), 41 Fed.Reg. 21632 (1976). It argued, first, that its discretion to adopt particular disclosure requirements was very broad, depending in every case on balancing, in its expert judgment, the incremental value of the proposed disclosure against the potentially confusing effect on investors and the increased costs to registrants. Despite this broad discretion, however, the Commission contended that its authority was limited to contexts related to the objectives of the federal securities laws. And these laws, in the Commission's view, were designed generally to require disclosure of financial information in the narrow sense only. The one partial exception to this principle, according to the Commission, was section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), under which the "primacy of economic matters . . . is somewhat less" because the purpose of that provision is to require fair opportunity for corporate suffrage. 40 Fed.Reg. at 51659.

Turning to its obligations under NEPA, the Commission concluded that although the statute made environmental concerns part of its substantive mandate, it did not go so far as to authorize the SEC to promulgate disclosure rules unrelated to its responsibilities under its organic statutes. NEPA, therefore,

> authorizes and requires the Commission to consider the promotion of environmental protection "along with other considerations" in determining whether to require affirmative disclosures by registrants under the Securities Act and the Securities Exchange Act, and, although the NEPA does not require any specific disclosures, as such, we have been required to explain

the alternatives which we considered in meeting our obligations under NEPA and the reasons why we have rejected substantial alternatives, in sufficient detail to permit judicial review.

40 Fed.Reg. at 51662 (footnote omitted).

In determining how best to fulfill these NEPA duties, the Commission considered five alternatives proposed during the proceedings:

> (1) comprehensive disclosures of the environmental effects of corporate activities, (2) disclosure of corporate noncompliance with applicable environmental standards, (3) disclosure of all pending environmental litigation, (4) disclosure of general corporate environmental policy, and (5) disclosure of all capital expenditures and expenses for environmental purposes.

40 Fed.Reg. at 51662. All of these the Commission ultimately rejected. From the summary of the record prepared by the SEC's staff, it appears that the SEC believed that alternatives (3), (4), and (5) had widespread support among commenters. However, the record reveals that there was never much organized or documented support for those alternatives. The appellees and the District Court did not treat them as significant. Alternative (2) was the early suggestion of Sonde & Pitt, *supra.* It received serious consideration but, after further comments, was rejected in Securities Act Release No. 5704 (May 6, 1976), 41 Fed.Reg. 21632 (1976).

Alternative (1) was the proposal of appellees herein. The Commission rejected it for the following reasons, 40 Fed.Reg. at 51662:

> We reject the first of these, proposed by the Natural Resources Defense Council, for a number of reasons. First, the interest among investors that may exist appears to be primarily in whether corporations are acting in an environmentally unacceptable manner, rather than in whether, and to what extent, corpora-

---

The magnitude of the minimum total cost of these environmental impact studies can only be estimated. But a conservative estimate would be in excess of $1 billion. Between 1954 and 1967 the number of manufacturing establishments employing 1000 persons or more held steady at 2000 establishments. Taking our estimate of the cost of environmental impact studies for plants employing 500 persons and multiplying by 2000 establishments produces the $1 billion estimate.

tions have gone beyond what is expected of them in this area. Second, unless existing environmental standards may be used as a reference point, both the costs to registrants and the administrative burdens involved in the proposed disclosure would be excessive. There appears to be no established, uniform method by which the environmental effects of corporate practices may be comprehensively described. Nor does there appear to be scientific agreement as to the harmfulness to the environment of many activities. It appears, therefore, that the proposed disclosures would be extremely voluminous, subjective and costly to all concerned. They also would not lend themselves to comparisons of different companies, which is of great importance to investors since investment decisions essentially involve a choice between competing investment alternatives.

Moreover, there appears to be virtually no direct investor interest in voluminous information of this type. Proponents, apparently conceding this, suggest that the disclosures be contained in documents which are filed with the Commission but which are not furnished directly to investors. They claim that analysts will study the materials and report their conclusions to investors in some meaningful, understandable form. This would merely substitute the opinions of such analysts, however, for the standards established by and pursuant to federal environmental legislation. And although diversity of viewpoint may be generally desirable, we have concluded that the additional costs and burdens necessary to achieve such diversity in this area greatly outweigh resulting benefits to investors and to the environment. . . . [44]

[44] The Commission could presumably attempt to develop its own environmental guidelines and standards in order to eliminate these difficulties. As difficult as it is to accept this type of reasoning, it follows from the excessively broad and overly-literal approach urged upon us and the District Court by the Natural Resources Defense Council. Of course, the costs involved in any such undertaking would be prohibitive. Moreover, in light of the Congressional delegation of responsibility in this area to the Environmental Protection Agency and the Council on Environmental Quality, any such effort on our part would be duplicative and of questionable propriety.

The SEC addressed the two inquiries posed by the District Court's remand order with particular reference to the environmental disclosure problem. It found indirect indications of investor interest and concluded that the main concern of investors with such information was "in determining how to vote their proxies or otherwise to act to influence management policies, rather than to make investment decisions." *Id.* at 51664. It concluded that the disclosure would probably have some effect on corporate behavior to the benefit of the environment, *id.* at 51665:

It seems clear that investors do not at present have ready access to objective information concerning the environmental practices of corporations. And although the relevant compliance reports are reasonably accessible to inhabitants of the localities most directly affected by such practices, there is presently no single governmental source to which an investor can look for the environmental reports filed by a company.

Given the fact that there is a degree of interest among some investors in information regarding corporate environmental practices, we conclude that the availability of such information may result in some investor or shareholder action. Participants in the proceeding pointed out that the submission of and voting on socially-oriented shareholder proposals has often caused a corporation to alter its behavior even though the proposals are defeated by a wide margin. Many participants also believe that disclosure requirements would serve to focus management attention on environmental issues and result in clearer recognition of the future costs and legal problems associated with environmental degradation.

The Commission determined, finally, not to adopt appellees' equal employment proposals, although it noted that "[w]e will, of course, continue to reevaluate the need for such requirements from time to time." *Id.*

at 51667. The Commission argued that existing disclosure provisions—which included rules explicitly requiring disclosure of certain economically material equal employment information—were sufficient to satisfy the primarily economic concerns of participants in the rulemaking proceeding. *Id.* at 51665–66. Further, it observed that:

> In the instant proceeding, over 100 different "social matters" were submitted in which "ethical" investors were said to be interested. As against this bewildering array of special causes, it has been suggested that investors are at least entitled to information regarding matters which embody fundamental national social principles as reflected in federal legislation or court decisions. We believe that persuasive arguments can be made, however, [that a] substantial amount of federal legislation to some extent embodies fundamental national social principles and, accordingly, many topics of social concern would remain. Thus, there is no distinguishing feature which would justify the singling out of equal employment from among the myriad of other social matters in which investors may be interested in the absence of a specific mandate comparable to that of NEPA. Disclosure of comparable non-material information regarding each of these would in the aggregate make disclosure documents wholly unmanageable and would significantly increase the costs to all involved without, in our view, corresponding benefits to investors generally.

*Id.* at 5166 (footnote omitted).

In addition to these broader objections to requiring disclosures of non-material equal employment information, the Commission raised a number of arguments against the specifics of appellees' proposals. It concluded that requiring disclosure of all equal employment opportunity proceedings, regardless of scope, would fail to screen out obviously frivolous or inflated claims. With regard to the appellees' proposal that registrants be required to file EEO–1 Reports containing statistical data about their work force composition, the Commission concluded that such disclosure was undesirable because "meaningful interpretation is dependent upon sophisticated analysis and other information such as the makeup of the available labor pools and existing hiring and promotion practices." *Id.*

Following the SEC's rejection of appellees' proposals, the parties cross-moved in the District Court for summary judgment. The District Court granted appellees' motion, *NRDC II, supra,* finding the SEC's action arbitrary and capricious on three principal grounds. First, and most important, the Court found it arbitrary that

> the Commission failed to consider the possibility of requiring disclosure of environmental information to shareholders (persons presently owning shares of a registrant corporation) solely in connection with proxy solicitations and information statements (provided to shareholders in connection with annual or other meetings) in order to promote "fair opportunity for the operation of corporate suffrage" without requiring identical disclosure in registration statements, prospectuses, and the like.

432 F.Supp. at 1205, *quoting* Securities Act Release No. 5627, *quoting SEC v. Transamerica Corp.,* 163 F.2d 511, 518 (3d Cir. 1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 418 (1948).

Second, the District Court found that the SEC's various assessments of costs to corporations and administrative burdens "all merely stand as bald assertions by the Commission," which the SEC had not substantiated, nor shown any serious effort in minimizing, before concluding they were excessive. *Id.* at 1206. Third, by refusing to work with the Council on Environmental Quality (CEQ) in developing SEC disclosure guidelines, but instead finding that comprehensive disclosure was the concern of CEQ and the Environmental Protection Agency in their own domain, the Commission violated the requirements of NEPA that it work together with CEQ on its own activity, thus "shunt[ing] aside [NEPA duties] in the bureaucratic shuffle." *Id.* at 1207, *quoting Flint Ridge Development Co. v. Scenic Riv-*

*ers Ass'n,* 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976).

The District Court also concluded that the Commission's determinations with respect to equal employment disclosure were arbitrary and capricious. The Commission, in the Court's view, had "made no attempt to analyze *either* the economic significance of equal employment opportunity matters *or* the costs and/or feasibility of devising appropriate disclosure guidelines." *NRDC II, supra,* 432 F.Supp. at 1210 (emphasis in original). Second, the Court found that, as in the environmental disclosure area, the Commission had failed properly to analyze the benefits and costs of equal opportunity disclosure in the limited context of proxy solicitations and information statements. Finally, the Court criticized the Commission's conclusion that disclosure of EEO–1 data would require sophisticated analysis in order for meaningful conclusions to be drawn about a registrant's susceptibility to equal employment opportunity litigation, finding itself "unable, on the basis of the record before it, to assess whether this 'need for sophisticated analysis' is a relevant consideration and how it compares for

example, with the need for sophisticated analysis of various financial disclosures." *Id.* at 1212.

Following the ruling of the District Court, the SEC appealed to this court. The District Court stayed the execution of its remand order pending the outcome on appeal.

## II

### A.

■ All but one appellee have alleged that either they or their members own corporate shares that they would like to vote in a financially prudent and ethically sound manner.[6] This allegation was sufficient to establish their standing to bring suit. Their interest was judicially cognizable,[7] personal to them,[8] and was arguably impaired by the lack of equal employment or environmental information.[9] It was not mere speculation that the relief sought—judicial determination that the SEC acted unlawfully or arbitrarily in denying the rulemaking petition— would lead to the promulgation of rules

---

**6.** Appellees NRDC, Project on Corporate Responsibility, Unitarian Universalist Association, American Baptist Home Mission Society, and Province of St. Joseph of the Capuchin Order each alleged that they hold corporate stock. Appellees NRDC and National Organization for Women alleged that they have members who are corporate shareholders.

Appellee Center on Corporate Responsibility has not alleged share ownership. Its claim to standing is based on an institutional interest in informing and educating the public about matters of social concern. The issue thus raised, that of "informational standing," involves complex and difficult considerations. *See generally Sierra Club v. Andrus,* 189 U.S.App.D.C. 117, 122, 581 F.2d 895, 900 n. 16 (1978), *cert. granted,* 439 U.S. 1065, 99 S.Ct. 829, 59 L.Ed.2d 30 (1979); *Scientists' Inst. for Pub. Information v. AEC,* 156 U.S.App.D.C. 395, 403, 481 F.2d 1079, 1087 n. 29 (1973). Because the position of the Center is identical to that of the other appellees, we find it unnecessary to determine whether it would have had standing had it been the sole plaintiff in the District Court. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

**7.** *See United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See generally Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 218, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Association of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**8.** *See Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Although National Organization for Women has not alleged share ownership, the fact it has shareholder members is sufficient to establish its personal interest. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton, supra,* 405 U.S. at 734–41, 92 S.Ct. 1361.

**9.** *Cf. Harrington v. Bush,* 180 U.S.App.D.C. 45, 68, 553 F.2d 190, 213 (1977). Many participants at the administrative proceeding indicated that environmental or equal employment information would be important to them in making investment decisions, including voting decisions. Much of this information is not readily available elsewhere.

identical or similar to those requested,[10] or that corporations subject to such rules would comply with them when promulgated.[11] Moreover, we have no doubt that these appellees, as corporate shareholders concerned about environmental quality, are within the broad zones of interest of both NEPA and the securities acts.[12]

### B.

■ The Commission next urges that the District Court erred because the SEC's decision not to adopt rules was nonreviewable. Under section 10 of the APA, 5 U.S.C. § 701(a), agency actions are judicially reviewable "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." This section creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate. *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ We think that judicial review was not precluded by the first section 701(a) exception. Neither the securities acts nor the APA, either expressly or by implication,[13] evidence anything approaching a clear and convincing legislative intent to negate review. At most, the SEC has pointed to some material in the legislative history of the APA that, even given the construction most favorable to the Commission's position, is inapposite to the present case.[14]

■■ The second exception, that for actions committed to agency discretion by law, applies to those rare instances where "'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, supra*, 401 U.S. at 410, 91 S.Ct. at 821. In practice, the determination of whether there is "law" to apply necessarily turns on pragmatic considerations as to whether an agency determination is the proper subject of judicial review. *See Langevin v. Che-*

10. *See, e.g., Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

11. *See United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Adams*, 188 U.S.App.D.C. 147, 149, 578 F.2d 389, 391 (1978). The existence of an independent third party in the causal chain has been a factor in some decisions denying standing on the ground that the injury alleged was too speculative. *See Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490 (1975); *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). In the present case, however, corporate compliance is to be expected given the SEC's proven capacity to compel disclosure and its formidable array of enforcement sanctions.

12. *See Association of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

13. *See Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977).

14. The Senate Committee Report noted that "[t]he refusal of an agency to grant the petition or to hold rulemaking proceedings . . . would not per se be subject to judicial *reversal*." Administrative Procedure Act—Legislative History, S.Doc.No. 248, 79th Cong., 2d Sess. 201 (1946) [hereinafter referred to as Legislative History] (emphasis supplied). Far from supporting the position of the SEC, this language implies that judicial review *would* sometimes be available in the circumstances mentioned. The Attorney General, in a statement annexed to the Senate Committee Report, did cite the failure to grant a rulemaking petition as an example of unreviewable action. *Id.* at 229–30. The Attorney General's gloss on the APA is entitled to some deference because of the role played by the Department of Justice in drafting the legislation. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). It is not entitled to particular deference, however, to the extent that it is inconsistent with the Senate Committee Report. More importantly, the Attorney General's observation is inapposite to the present case, in which challenge is brought, not to the agency's failure to grant a rulemaking petition, but to the agency's determination made after the granting of the petition and the holding of extensive rulemaking proceedings.

*nango Court, Inc.*, 447 F.2d 296 (2d Cir. 1971); *Medical Committee for Human Rights v. SEC*, 139 U.S.App.D.C. 226, 234, 432 F.2d 659, 667 (1970), *vacated and remanded with instructions to dismiss as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion,"* 82 Harv.L.Rev. 367 (1968). In making this determination, we first identify as precisely as possible the aspects of the agency's action against which challenge is brought. We then evaluate the relevance of three particularly important factors: the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review. *See Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970). Finally, we inquire whether the considerations in favor of nonreviewability thus identified are sufficiently compelling to rebut the strong presumption of judicial review.

Appellees' challenge, upon analysis, can be seen to rest upon two somewhat different grounds. The first is that the SEC allegedly failed to comply with certain *procedures* mandated by NEPA. In this category are the contentions that the SEC neglected to consult properly the CEQ and that it failed to consider the alternatives of environmental disclosure rules limited to proxy material. Although these arguments are "essentially procedural," *see Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the latter one necessarily involves a substantive element. If the court is to determine whether an agency has fulfilled its procedural NEPA duties by "considering" alternatives, it must exercise at least a minimal scrutiny over the rationality of the agency's reasons for rejecting likely alternatives. To this extent at least, appellees' NEPA contentions can be thought of as raising mixed questions of substance and procedure.

The second ground is purely substantive argument that the Commission's ultimate decision not to adopt the particular rules suggested by appellees was arbitrary and capricious. In this category falls appellees' entire challenge to the SEC's decision not to adopt equal employment rules, as well as their contention that the agency's analysis of the costs and benefits of environmental disclosure was not supported in the administrative record.

■ We distinguish between these grounds because, in our view, the reviewability analysis is quite different in the two cases. The first ground—appellees' procedural NEPA challenge—presents little difficulty. Congress, in NEPA, has commanded federal agencies, "to the fullest extent possible," NEPA section 102, 42 U.S.C. § 4332, to consider alternatives and consult with CEQ. Congress having imposed these duties on the SEC, appellees can argue with considerable force that their rights as participants in the rulemaking proceeding have been infringed by the SEC's alleged failures.

The SEC's effectiveness in carrying out its mandate will not, in our view, be greatly impaired by judicial review of its procedural compliance with NEPA. For one thing, NEPA made environmental considerations part of the SEC's mandate, *NAACP v. FPC*, 172 U.S.App.D.C. 32, 42, 520 F.2d 432, 442 (1975), *aff'd*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), and judicial review should serve to ensure that this aspect of the SEC's statutory duties is fully implemented. Because such review is essentially procedural, it will not impose undesirable substantive results on the agency. Finally, judicial review in this context will not be a recurring burden on the agency. The SEC represented that these rulemaking proceedings were designed to satisfy fully its NEPA duties. Securities Act Release No. 5569 (Feb. 11, 1975), 40 Fed.Reg. 7013 (1975). In thus compressing the fulfillment of its NEPA duties, the SEC reduced the burden of judicial review to challenges brought to the single rulemaking proceed-

ing, and thereby minimized the potential interference with its activities.[15]

Moreover, the issues in this context will generally be appropriately framed for judicial consideration. The function we are here asked to perform—that of evaluating an agency's procedural compliance with a statutory norm—is within our traditional area of expertise. *See Weyerhaeuser Co. v. Costle*, 191 U.S.App.D.C. 309 at 328, 590 F.2d 1011 at 1030 (1978). Although, as we have noted, this review will involve some examination of the rationality of the SEC's decision, we are confident of our ability to perform such substantive scrutiny limited to ensuring that the SEC has fully and in good faith complied with NEPA's procedural command. Further, because we do not at this point review the rationality of the agency's ultimate substantive decision, the difficulties inherent in judicial review of an agency's decision *not* to adopt proposed rules, *see* pp. ———— of 196 U.S.App. D.C., pp. 1046–1047 of 606 F.2d *infra,* are not compelling in this context. Because our review is limited to ensuring that statutorily prescribed procedures have been followed, we are confident that the administrative record will usually be sufficient to ensure meaningful review. Thus, especially in light of the presumption of reviewability, we conclude that the question of the SEC's compliance with NEPA procedures was appropriate for judicial review.

■ Appellees' challenge to the rationality of the SEC's decision not to adopt their proposed environmental and equal employment rules, however, presents a somewhat different calculus of interests among plaintiffs, agency, and court. This is so largely because the agency, in our view, was under no obligation to adopt rules identical to or even similar to those sought by appellees. As we note in part II–C *infra,* the Commission has been vested by Congress with broad discretionary powers to promulgate (or not to promulgate) rules requiring disclosure of information beyond that specifically required by statute. Rather than casting disclosure rules in stone, Congress opted to rely on the discretion and expertise of the SEC for a determination of what types of additional disclosure would be desirable. Although Congress, in NEPA, made environmental considerations part of the SEC's substantive mission, we do not believe that NEPA goes so far as to *require* the SEC to promulgate specific rules. *See Vermont Yankee, supra,* 435 U.S. at 558, 98 S.Ct. 1197; *Calvert Cliffs' Coordinating Committee v. AEC,* 146 U.S.App.D.C. 33, 36, 449 F.2d 1109, 1112 (1971).

■ The interest of plaintiffs in this context will thus rarely present unusual or compelling circumstances calling for judicial review. In the present case, for example, the SEC has not invaded any of appellees' substantive statutory or constitutional rights, nor singled them out for special and seemingly unfair treatment, nor even, indeed, taken any action to alter the *status quo ante.*[16]

Judicial review will, to a limited extent, interfere with an agency's effective performance of its statutory mission. Requiring an agency to defend in court its decision not to adopt proposed rules will divert scarce institutional resources into an area that the agency in its expert judgment has already determined is not even worth the effort already expended. The danger of throwing good money after bad, moreover, also exists in a more subtle form because the very prospect of litigation may cause the agency to give a proposal more elaborate consideration than it might actually merit.

These considerations, however, are more compelling in the context of judicial review of an agency's denial of the initial rulemak-

---

**15.** There can be no question but that the SEC was justified in proceeding through a general rulemaking approach. *Cf. Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

**16.** This is obviously not to say that the mere fact an agency has not changed the *status quo* is sufficient, in itself, to preclude review. *See* § 10(e)(1) of the APA, 5 U.S.C. § 706(1); *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).

ing petition than where, as here, the agency has granted the petition and held extensive rulemaking proceedings.[17] Obviously frivolous or unworkable proposals can be weeded out at the outset simply by denying the petition. When an agency agrees to conduct rulemaking proceedings, it evidences its view that the proposals are sufficiently meritorious to warrant further investigation, as well as its willingness to defend in court such rules as may eventually be adopted. Thus, judicial review in this context would be relatively infrequent, would not be unjustifiable in terms of the merits of the proposals, and would not, in our view, seriously interfere with the agency's budget and personnel planning.

Further, we note that "there is a substantial public interest in having important questions of corporate democracy raised before the Commission and the courts by interested, responsible private parties." *Medical Committee, supra*, 139 U.S.App. D.C. at 234, 432 F.2d at 667. In the present case, appellees have brought to the Commission's attention a perspective, different from that of most of its registrant corporations, that it might not otherwise have fully appreciated. They have performed the public service of causing the Commission to re-examine its disclosure policies in light of the fundamental national priorities expressed in NEPA and in federal equal employment legislation. *Cf. NAACP v. FPC, supra.* Judicial review of agency decisions not to adopt rules would help ensure that the agency gives due consideration to citizen participation, and in this sense might actually enhance the agency's effectiveness in furthering the public interest.[18]

Perhaps the strongest argument against reviewability is the concern that the issues posed will often not be well-suited for judicial resolution. An agency's discretionary decision *not* to regulate a given activity is inevitably based, in large measure, on factors not inherently susceptible to judicial resolution—*e. g.,* internal management considerations as to budget and personnel; evaluations of its own competence; weighing of competing policies within a broad statutory framework. *Cf. FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (*per curiam* ). Further, even if an agency considers a particular problem worthy of regulation, it may determine for reasons lying within its special expertise that the time for action has not yet arrived. *Cf. SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). The area may be one of such rapid technological development that regulations would be outdated by the time they could become effective, or the scientific state of the art may be such that sufficient data are not yet available on which to premise adequate regulations. *Cf. Industrial Union Department v. Hodgson*, 162 U.S.App.D.C. 331, 338–39, 499 F.2d 467, 474–75 (1974). The circumstances in the regulated industry may be evolving in a way that could vitiate the need for regulation, *cf. Action for Children's Television v. FCC*, 183 U.S.App.D.C. 437, 459, 564 F.2d 458, 480 (1977), or the agency may still be developing the expertise necessary for effective regulation, *cf. SEC v. Chenery Corp., supra*, 332 U.S. at 202, 67 S.Ct. 1575.

Moreover, added to the problems already inherent in reviewing the record support for informal rulemaking decisions is the additional concern that, in the context of an agency's non-adoption of a rule, the record and reasons statement will be of little use to a reviewing court unless they are narrowly focused on the particular rule advocated by plaintiff or petitioner. There are an infinite number of rules that an agency could adopt in its discretion; unless the

---

17. We intimate no view as to whether, or to what extent, an agency's denial of a rulemaking petition would be subject to review.

18. Public participation in agency decision making is increasingly recognized as a desirable objective. *See generally* Stewart, *The Reformation of American Administrative Law*, 88 Harv.L.Rev. 1669 (1975). Congress to some extent recognized the value of citizen input when it provided a right to petition for rulemaking in the APA. Section 4(e) of the APA, 5 U.S.C. § 553(e).

agency has carefully focused its considerations, judicial review will have an undesirably abstract and hypothetical quality. However, in a context like the present one, in which the agency has in fact held extensive rulemaking proceedings narrowly focused on the particular rules at issue, and has explained in detail its reasons for not adopting those rules, we believe that the questions posed will be amenable to at least a minimal level of judicial scrutiny.

Our conclusion is buttressed by two recent cases in which this court reviewed agency decisions not to promulgate rules. *National Black Media Coalition v. FCC,* 191 U.S.App.D.C. 55, 589 F.2d 578 (1978), was a challenge to an FCC decision not to adopt certain quantitative program standards for television broadcasters involved in comparative renewal proceedings. The standards had been proposed in detail by the FCC and had been the subject of extensive rulemaking proceedings, lasting six years and involving oral argument and extensive written comments. Although noting that "[t]he decision not to promulgate quantitative standards was a policy judgment traditionally left to agency discretion," *id.* at 58, 589 F.2d at 581, the court reviewed the FCC's decision on the merits without explicitly considering the reviewability question.

*Action for Children's Television, supra,* was a challenge to an FCC decision not to adopt certain rules proposed by a public interest organization to improve children's television. As in *National Black Media Coalition,* the FCC held extensive rulemaking proceedings focused on the particular rules suggested. Again without explicitly considering the issue of reviewability, the court proceeded to uphold the FCC on the merits.

These cases, in our view, do not support a general rule that discretionary agency decisions not to adopt rules are reviewable *per se.* In this situation, as we have noted, the relevant factors incline against reviewability: the interests of the plaintiffs are usually not compelling, there is a possibility of some minor interference with effective agency performance, and the issues will often be poorly suited for judicial resolution. Rather, *Action for Children's Television* and *National Black Media Coalition* stand for the more limited principle that, in light of the strong presumption of reviewability, discretionary decisions not to adopt rules are reviewable where, as here, the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested but not adopted.[19]

### C.

It has been said that courts and administrative agencies function, not as "wholly independent and unrelated instrumentalities of justice," *United States v. Morgan,* 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211 (1939), but as "partners" in furtherance of the public interest. *Kennecott Copper Corp. v. EPA,* 149 U.S.App.D.C. 231, 233–34, 462 F.2d 846, 848–49 (1972); *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (1970),

---

**19.** Our conclusion in the present case finds support in this court's treatment of the reviewability of SEC "no-action" determinations. In *Medical Comm. for Human Rights v. SEC, supra,* 139 U.S.App.D.C. at 232–240, 432 F.2d at 665–73, this court held reviewable a decision by the full Commission not to object to a corporation's omission from its proxy statements of certain material proposed by a shareholder. In large measure, the court's decision was based on its conclusion that the agency decision in question had sufficient "formality" to support judicial review. In *Kixmiller v. SEC,* 160 U.S.. App.D.C. 375, 492 F.2d 641 (1974), however, the court held unreviewable a decision distinguishable from that in *Medical Committee* only by the fact that it was made by the SEC staff alone and was not endorsed by the full Commission.

We have some doubt as to the continued vitality of *Medical Committee* in light of the Supreme Court's grant of certiorari, 401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 322 (1971); its remand of the case with instructions to dismiss as moot, 404 U.S. 403 (1972); and this court's subsequent narrowing decision in *Kixmiller.* Nevertheless, we feel that *Kixmiller's* way of distinguishing *Medical Committee* was based on a sound principle. This is that, in general, the more complete an agency's consideration of an issue, the more likely it is that the ultimate decision not to take action will be a proper subject of judicial review.

*cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). In this collaborative enterprise, the courts are often asked to depart from traditional modes of judicial decisionmaking and to assume an essentially legislative role. The partnership, if indeed that concept be at all apt, is thus an "uneasy" one at best, *Industrial Union Department v. Hodgson,* 162 U.S.App.D.C. 331, 333, 499 F.2d 467, 469 (1974); *Associated Industries v. Department of Labor,* 487 F.2d 342, 354 (2d Cir. 1973), as courts struggle to perform their congressionally-mandated task of judicial review without encroaching on territory which as judges they are ill-suited to enter.

 The balance to be struck is that between the goal of efficient and effective agency action, on the one hand, and the value of judicial review in ensuring the rationality and fairness of agency decisionmaking, on the other. Congress recognized the need for such a balance when it enacted the various judicial review provisions in section 10(e) of the APA, 5 U.S.C. § 706. Thus, in the area of traditional judicial preeminence, that of determining pure questions of law, Congress commanded an exacting judicial scrutiny. *Id.* §§ 10(e)(2)(B), (C), (D), 5 U.S.C. §§ 706(2)(B), (C), (D). But Congress also understood that administrative agencies were more competent than the courts in many specialized areas of fact determination, and particularly in making quasi-legislative judgments about matters of social and economic policy. It recognized this in the APA by requiring the courts to exercise considerable deference in their review of such issues. *Id.* §§ 10(e)(2)(A), (E), 5 U.S.C. §§ 706(2)(A), (E).

As we have previously noted, *see* Part II–B *supra,* the present case involves both a challenge to the SEC's procedural compliance with NEPA and a claim that the substantive result of the SEC's procedures, in both the equal employment and environmental areas, was arbitrary and capricious. The proper scope of judicial review is, we think, quite different in these two aspects of the case.

 The procedural NEPA challenge is essentially a claim that the SEC's decisionmaking was "without observance of procedure required by law," section 10(e)(2)(D) of the APA, 5 U.S.C. § 706(2)(D). Our review of an agency's procedural compliance with statutory norms is an exacting one. Moreover, the courts, in cases involving NEPA's environmental impact statement requirement, have exercised particularly stringent review of procedural compliance with NEPA, W. Rodgers, *Environmental Law* 716–717 (1977), at least when the agency involved does not include environmental protection within its primary mission, *see* Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509 (1974).

To be sure, we deal here, not with NEPA's often-litigated environmental impact statement provision, but with other relatively uncharted provisions of NEPA section 102.[20] These provisions, because they are not limited to "major" federal actions that "significantly affect[ ] the quality of the human environment," are of far broader applicability than the impact statement requirement. For this reason the stringency of review applied in the impact statement situation may not be entirely feasible here. *But see Calvert Cliffs'*

---

**20.** Section 102(1), 42 U.S.C. § 4332(1), directs that

· to the fullest extent possible . . . the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in [NEPA] . . . .

Section 102(2)(B), 42 U.S.C. § 4332(2)(B), requires all federal agencies to

identify and develop methods and procedures, in consultation with [CEQ], which will ensure that presently unquantified environ-

mental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations. . . .

Section 102(2)(E), 42 U.S.C. § 4332(2)(E), requires all federal agencies to

study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. . . .

*Coordinating Committee, supra.* Nevertheless, we recognize that environmental concerns to some extent run counter to the SEC's primary mandate of financial protection of investors, and that there is here a substantial role for the court to play in ensuring that NEPA's procedural commands are carried out in full measure by the SEC.

In contrast to this exacting review of the SEC's compliance with NEPA procedures, our review of the substantive rationality of the SEC's decision not to adopt appellees' proposed environmental and equal employment rules is necessarily far more circumscribed in scope. The Commission's decision in the present case is the product of the informal rulemaking procedures of section 4 of the APA, 5 U.S.C. § 553, and is to be reviewed under section 10(e)(2)(A) of the Act, 5 U.S.C. § 706(2)(A). *Vermont Yankee, supra,* 435 U.S. at 535–36 n. 14, 98 S.Ct. 1197 n. 4; *FCC v. National Citizens Committee,* 436 U.S. 775, 802–03, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Weyerhaeuser Co. v. Costle,* 191 U.S.App.D.C. 309, at 322, 590 F.2d 1011, at 1024 (1978). That provision requires us to set aside "agency action, findings, and conclusions," [21] found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As we have recognized, "arbitrary," "capricious," and "abuse of discretion" are "far from being entirely discrete as a matter of the ordinary meaning of language, and, indeed, are in some respects cumulative rather than differential in their applicability." *Weyerhaeuser Co. v. Costle, supra,* at 322, 590 F.2d at 1024.

Rather than denoting a fixed template to be imposed mechanically on every case within their ambit, these words summon forth what may best be described as an attitude of mind in the reviewing court— one that is "searching and careful," *Citizens to Preserve Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. 814, yet, in the last analysis, diffident and deferential.[22]

In applying the "arbitrary and capricious" standard, it is well to keep in mind the considerations that led Congress to commit to the courts a "multifaceted review function." *Weyerhaeuser Co. v. Costle, supra,* 191 U.S.App.D.C. at 322, 590 F.2d at 1024. As we noted in *Weyerhaeuser, id.* at 323, 590 F.2d at 1025, "[d]ue concern both for the intent of Congress in drafting the particular statute at issue, and, more generally, for the 'boundaries between the legislative and judicial function,' *Industrial Union Dep't v. Hodgson,* 162 U.S.App. D.C. 331, 339, 499 F.2d 467, 475 (1974), often demands that we exercise certain aspects of our review function with more circumspection than is appropriate to others." Some facets of an administrative decision, because they raise issues within the courts' area of competence, are well suited to judicial oversight. Without abandoning completely our attitude of deference, and thereby depriving the words "arbitrary" and "capricious" of any meaning, *see Vermont Yankee, supra,* 435 U.S. at 554, 98 S.Ct. 1197, we can review these issues with confidence that our participation will contribute to the rationality and fairness of agency decisionmaking without detracting unduly from its effectiveness.[23] Other aspects of

**21.** Although the agency decision here under review does not fall comfortably within the category of agency "action", we have no doubt that Release No. 5627 constitutes "findings" and "conclusions" of the SEC within the meaning of this section.

**22.** As Justice Frankfurter noted, in construing the scope of "substantial evidence" review, "the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words . . . .. There are no talismanic words that can avoid the process of judgment. The difficulty is that we cannot escape, in relation to this problem, the use of

undefined defining terms." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 489, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

**23.** More exacting scrutiny will be particularly useful when for some reason the presumption of agency regularity, *see Citizens to Preserve Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. 814, is rebutted, as where the agency has demonstrated undue bias towards particular private interests, *see, e. g., Central Florida Enterprises, Inc. v. FCC,* 194 U.S.App.D.C. 118, 598 F.2d 37 (1978); where the agency has had a history of "ad hoc and inconsistent judgments" on a particular question, *Local 777 v. NLRB,* 195 U.S.

administrative action, however, are poorly suited for judicial scrutiny, and, without sacrificing our statutory duty of review, we must as to these issues exercise a high degree of deference to the agency's determination. In short, the concept of "arbitrary and capricious" review defies generalized application and demands, instead, close attention to the nature of the particular problem faced by the agency.[24] The stringency of our review, in a given case, depends upon analysis of a number of factors, including the intent of Congress, as expressed in the relevant statutes, particularly the agency's enabling statute; the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the court effectively to evaluate the questions posed. Only through such a flexible approach can we review the multifarious types of agency actions as responsible participants in an enterprise of practical governance.[25]

We note, first, that Congress, in the 1933 and 1934 Acts, has seen fit to delegate broad rulemaking authority to the SEC. These acts were passed during an unprecedented economic crisis in which regulation of the securities markets was seen as an urgent national concern. The SEC, charged with swiftly and effectively implementing this national policy, was necessarily given very broad discretion to promulgate rules governing corporate disclosure. The degree of discretion accorded the Commission is evident from the language in the various statutory grants of rulemaking authority.[26]

App.D.C. 280 at 287–289, 603 F.2d 862 at 869–871 (1978); where the agency has arrived at an identical result after remand from a reviewing court for further explanation of reasons, e. g., Food Marketing Inst. v. ICC, 190 U.S.App.D.C. 388, 392–93, 587 F.2d 1285, 1289–90 (1978); accord, Citizens to Preserve Overton Park, supra, 401 U.S. at 420, 91 S.Ct. 814; or when an agency has departed from its consistent and longstanding precedents or policies, see Office of Communication of United Church of Christ v. CAB, 191 U.S.App.D.C. 360 at 366–367, 590 F.2d 1062 at 1068–1069 (1978); International Union v. NLRB, 148 U.S.App.D.C. 305, 317–18, 459 F.2d 1329, 1341–42 (1972).

**24.** We might add, parenthetically, that his observation would appear to hold true for other standards than "arbitrary and capricious" review. Thus, although we generally review pure questions of law de novo, we will accord deference to an agency's interpretation of its own governing statute. E. g., Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484, 513 (1978); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 782, 13 L.Ed.2d 616 (1965). Our review under the "substantial evidence" test will tend to be more deferential when the facts at issue are at the frontiers of scientific knowledge. Hercules, Inc. v. EPA, 194 U.S.App.D.C. 172 at 187, 598 F.2d 91 at 106 (1978); EDF v. Costle, 188 U.S.App.D.C. 95, 97, 578 F.2d 337, 339 (1978); Industrial Union Dep't v. Hodgson, 162 U.S.App.D.C. 331, 338–39, 499 F.2d 467, 474–75 (1974), cited with approval, FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 795, 814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). To give another example, we have noted that the extent of judicial scrutiny of an agency's "basis and purpose" statement will vary with the context. Weyer-haeuser Co. v. Costle, supra, 191 U.S.App.D.C. at 322–23 n. 11, 590 F.2d at 1024 n. 11.

**25.** Academic commentators have frequently observed that flexibility in scope has always been a hallmark of conscientious judicial review of agency action. See, e. g., K. Davis, Administrative Law of the Seventies § 29.01 (1976) ("[f]ormulas about scope of review do not always control judicial action; the formulas can be bent in any direction, in accordance with what the reviewing court deems to be the needs of justice or the public welfare"); G. Robinson & E. Gellhorn, The Administrative Process 235–237 (1974); J. Mashaw & R. Merrill, Introduction to the American Public Law System 275 (1975) ("the statutorily articulated standard of review does not always dictate the stringency of review actually exercised"); Administrative Procedures in Government Agencies: Final Report of the Attorney General's Committee, S.Doc.No. 8, 77th Cong., 1st Sess. 91 (1941) (stringency of review influenced by a "variety of inarticulate factors"); Gardner, Federal Courts and Agencies: An Audit of the Partnership Books, 75 Colum.L.Rev. 800, 822 (1975) (empirical study); McGowan, Book Review, 74 Colum.L.Rev. 1015, 1022 n. 14 (1974).

**26.** For example, §§ 7 and 10(c) of the 1933 Act, 15 U.S.C. §§ 77g and 77j(c), prescribe certain types of information to be disclosed in registration statements and prospectuses, respectively, and authorize the SEC to require disclosure of such other information "as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." Similarly, § 12(b) of the 1934 Act, 15 U.S.C. § 78l(b), provides that the SEC "may by rules [and] regulations require," in applications for the reg-

The legislative history of the 1934 Act, the statute that created the SEC, reflects the breadth of the Commission's intended discretion. The House Report stated that

the delegation [of authority to the Federal Trade Commission (which was to administer the act as the bill was then drafted) is] made only with the indication of such maximum standards for discretion as, in the considered judgment of the Committee, the technical character of the problems to be dealt with would permit. The bill legislates specifically just as far as the Committee feels it can. The original bill submitted to the Committee dealt very specifically and definitely with a number of admitted abuses. In many cases, however, the argument was made that while the solutions offered might be correct, their effects were so far-reaching as to make it inadvisable to put these solutions in the form of statutory enactments that could not be changed in case of need without Congressional action. . . . It is for that reason that the bill in dealing with a number of difficult problems singles out these problems as matters appropriate to be subject to restrictive rules and regulations, but leaves to the administrative agencies the determination of the most appropriate form of rule or regulation to be enforced. In a field where practices constantly vary and where practices legitimate for some purposes might be turned to illegitimate and fraudulent means, broad discretionary powers in the administrative agency have been found [to be] practically essential. . . .

H.R.Rep.No. 1383, 73d Cong., 2d Sess. 6–7 (1934). The same theme is echoed in the Senate Committee report:

so delicate a mechanism as the modern stock exchange cannot be regulated efficiently under a rigid statutory program. Unless considerable latitude is allowed for the exercise of administrative discretion, it is impossible to avoid, on the one hand, unworkable "strait-jacket" regulation and, on the other, loopholes which may be penetrated by slight variations in the method of doing business.

S.Rep.No. 792, 73d Cong., 2d Sess. 5 (1934). Similarly, in discussing the Commission's power to require disclosure in corporate reports, the Senate Committee noted that

[t]he Commission is given complete discretion . . . to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors.

*Id.* at 10.[27]

These inferences supporting deferential review drawn from the Securities Acts are supplemented by other considerations, im-

---

istration of a class of securities, such information respecting the issuer's organization, financial structure, nature of business, and financial statements as it deems "necessary or appropriate in the public interest or for the protection of investors."

The 1934 Act's periodic reporting and proxy solicitation provisions leave the SEC with even greater discretion to require disclosure by rulemaking. Section 13(a) of that Act, 15 U.S.C. § 78m(a), requires each issuer of a security registered under § 12 to keep current the information in its application or registration statement and to file periodic reports in accordance with rules "the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security." Section 14(a) of the Act, 15 U.S.C. § 78n(a), prohibits the solicitation of proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The SEC's general rulemaking authority is contained in § 19(a) of the 1933 Act, 15 U.S.C. § 77s(a), and § 23(a) of the 1934 Act, 15 U.S.C. § 78w(a), which respectively authorize the SEC to promulgate such rules "as may be necessary to carry out the provisions of this subchapter," and "as may be necessary or appropriate to implement the provisions of this chapter for which [it is] responsible or for the execution of the functions vested in [it] by this chapter . . . ."

27. Congress reaffirmed its faith in the SEC's competence to exercise its delegated authority responsibly and effectively when, in 1975, it entrusted the Commission with the task of facilitating the establishment of national market and clearing systems. Securities Acts Amendments of 1975, Pub.L. 94–29, 89 Stat. 141; *see generally Bradford Nat'l Clearing Corp. v. SEC,* 191 U.S.App.D.C. 383, 590 F.2d 1085 (1978).

plicit in the APA, as to the court's ability to review effectively the SEC's decision. As is typical in informal rulemaking cases under section 4 of the APA, 5 U.S.C. § 553, many of the issues raised here are within the province of agency expertise and do not readily lend themselves to judicial oversight. The SEC, for example, attempted to quantify as nearly as possible the extent of "ethical investor" interest in the information sought by appellees. Because of the nature of this inquiry, precise quantification is difficult if not impossible; and the court must necessarily defer to the SEC's judgment based on experience in evaluating the evidence of record on this question. Other factual issues required the Commission to make forecasts—e. g., the probable burden on corporations of complying with the proposed rules; the extent to which the added mass of information would confuse or mislead the average investor; and the likelihood that disclosure of the type requested would cause corporations to adopt sounder environmental policies. Predictive judgments like these "necessarily involve[ ] deductions based on the expert knowledge of the agency," *FCC v. National Citizens Comm., supra,* 436 U.S. at 814, 98 S.Ct. at 2122, *quoting FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961), and, moreover, tend to be infused with policy considerations that are not appropriate subjects of close judicial scrutiny. *Bradford National Clearing Corp., supra,* 191 U.S.App.D.C. at 402 & n. 30, 590 F.2d at 1104 & n. 30.

▪ Finally, we must also inevitably be more circumspect in our review when, as here, it is based on a record of an informal rulemaking proceeding. The record

presented to us on appeal or petition for review is a sump in which the parties have deposited a sundry mass of materials that have neither passed through the filter of rules of evidence nor undergone the refining fire of adversarial presentation. *Industrial Union Dep't, supra,* 162 U.S.App.D.C. at 338, 499 F.2d at 474. The lack of discipline in such a record, coupled with its sheer mass—even when reduced into a joint appendix—often makes the record of informal rulemaking a less than fertile ground for judicial review.[28] *Weyerhaeuser Co. v. Costle, supra,* 192 U.S.App.D.C. at 90, 590 F.2d at 1206.

We find support for these considerations in the fact that this case involves an agency decision *not* to adopt a rule. As discussed in Part II–B *supra,* this peculiar context led us to inquire seriously whether the SEC's decision was reviewable at all. Yet the question of reviewability cannot be divorced from that of scope of review.[29] In cases where courts have evidenced serious doubts about the reviewability of agency action, they have tended to couple their decision to review with a particularly narrow scope of review. *See Dunlop v. Bachowski,* 421 U.S. 560, 568, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Medical Committee, supra,* 139 U.S. App.D.C. at 241–42, 432 F.2d at 674–75.

Thus, the considerations that counsel against judicial review of a decision not to adopt rules by informal rulemaking also call for us, when we do review, to exercise special deference. We are not unmindful of the fact that the SEC, in good faith compliance with the District Court's decision in *NRDC I,* has already held further proceedings even more extensive than those involved in its initial decision not to adopt the

---

**28.** The entire file of the most recent rulemaking proceeding, for example, includes documents in excess of 10,000 pages, and is divided into letters of comment, transcripts of testimony received at the hearing, and exhibits prepared in the course of testimony. The joint appendix prepared by the parties reduced this to 877 pages—considerably shorter than many joint appendices in rulemaking cases.

**29.** As we noted in *Medical Committee, supra,* 139 U.S.App.D.C. at 240, 432 F.2d at 673, "as-

sertions of discretion inevitably raise questions of degree which must be appraised in the context of the relevant provisions of law and the nature of the particular action sought to be reviewed: '[T]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed.' " *quoting* 4 K. Davis, Administrative Law Treatise 33 (1958) (emphasis in original).

rules sought by appellees. Before we once more remit the case to the Commission, and thereby further divert its resources from areas that in its expert judgment are of more pressing concern, we should make doubly sure that the SEC's decision is, in fact, not sustainable on the administrative record. Similarly, we note that the environmental rules requested by appellees were only one of several alternatives considered by the Commission in this rulemaking proceeding. Although these rules were, indeed, the primary subject of the proceeding, the existence of other alternatives did tend to defocus the record and render it even less amenable to judicial review than are such records typically.

■■■ In light of these considerations, the scope of our review is best defined as follows: We will exercise relatively careful scrutiny to ensure that the SEC has scrupulously followed NEPA procedures, in particular, the requirement of consultation with CEQ and the command to consider alternatives. As part of this oversight we will demand that the Commission consider reasonably obvious alternative disclosure rules, and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review.[30] At the same time, however, our review of the Commission's factual, and particularly its policy, determinations will perforce be a narrow one, limited to ensuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that

those facts have some basis in the record.[31] Finally, we must see "whether those facts and legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made." *Weyerhaeuser Co. v. Costle, supra,* 191 U.S. App.D.C. at 325, 590 F.2d at 1027.

### III

#### A.

■■■ Appellees' strongest challenge to the SEC's decision, and the District Court's primary basis for remanding the decision to the SEC for further proceedings, was that the agency "failed to consider the possibility of requiring disclosure of environmental information to shareholders . . . solely in connection with proxy solicitations and information statements (provided to shareholders in connection with annual or other meetings) in order to promote 'fair opportunity for the operation of corporate suffrage' . . . ." *NRDC II, supra,* 432 F.Supp. at 1205. As to this essentially procedural issue, as we have noted, we will exercise a relatively stringent review to ensure that the SEC fully complied with the statutory directive to consider alternatives. Nevertheless, although the question is not insubstantial, we conclude, for several reasons, that the SEC was not required under NEPA to consider a limited proxy disclosure rule.

In *NRDC, Inc. v. Morton,* 148 U.S.App. D.C. 5, 458 F.2d 827 (1972), this court for-

---

**30.** The SEC itself recognized a similar standard as an accurate description of its duties under NEPA. 40 Fed.Reg. 51662.

**31.** The SEC argues, *citing Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), that the scope of review should be limited to the reasons statement and should not include examination of the record. *Dunlop,* however, arose in the very different context of a suit challenging the Secretary of Labor's decision not to bring suit to set aside a union election under § 401 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481 (LMRDA). The Court's conclusion in *Dunlop* that judicial review could not look behind the reasons statement was based on unusual considerations present in that context: the special discretion afforded the Secre-

tary of Labor under the LMRDA, and the congressional intent evident in the LMRDA to prevent undue judicial intervention into union affairs. 421 U.S. at 568–73, 95 S.Ct. 1851.

In contrast to the *Dunlop* case, the usual rule is that a reviewing court does examine the record in determining whether an agency's action is arbitrary or capricious. Section 10(e)(2) of the APA, 5 U.S.C. § 706(2) (court must "review the whole record or those parts of it cited by a party"); *FPC v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976) (*per curiam*); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (*per curiam*); *Citizens to Preserve Overton Park, supra,* 401 U.S. at 420, 91 S.Ct. 814.

mulated the test of agency obligation to consider an alternative under NEPA. We there said that any such requirement is subject to a "rule of reason", *id.* at 12, 458 F.2d at 834, under which a "crystal ball" inquiry is not required, *id.* at 15, 458 F.2d at 837. "The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite." *Id.* Nevertheless, under the rule of reason, the agency is not released from its obligation to consider alternatives "to the fullest extent possible," section 102 of NEPA, 42 U.S.C. § 4332. As the concept of reasonableness implies, the rule is one of moderation, neither rubber nor iron.

The *Morton* case itself is an illustration: We there required, in the environmental impact statement prepared in connection with a sale of oil and gas lease tracts, that the preparing agency consider the alternative of eliminating oil import quotas although this action was beyond its authority; but we did not require consideration of other, speculative "alternatives" such as desulfurization of coal, oil shale development, and the like. Although *Morton* involved NEPA's impact statement provision, we think the rule of reason is sufficiently flexible as to be applicable to the present case. Thus, we must determine whether the alternative of requiring environmental disclosure limited to proxy materials and related information statements was "readily identifiable by the agency," *NRDC v. Morton,* supra, 148 U.S.App.D.C. at 15, 458 F.2d at 837.

We conclude that, for a number of reasons, the Commission was not obligated to consider the proxy alternative in this proceeding. First, we note that this alternative was not strongly pressed on the Commission during the round of comments. This fact does not in itself release the SEC from its obligation to consider readily identifiable alternatives. Because NEPA serves a broad public purpose, and imposes on federal agencies an independent duty to take action irrespective of private initiation or input, a strict waiver rule would be inappropriate. However, the failure of the participants to focus specifically on the proxy disclosure alternative does have considerable bearing on whether this option was readily identifiable by the SEC.

■ Second, an agency is not required, under NEPA, to consider alternatives when such consideration would serve no purpose. Thus, an agency need not consider in its impact statement alternatives with consequences indistinguishable from the action proposed. *Citizens for Safe Power v. NRC,* 173 U.S.App.D.C. 317, 327–28, 524 F.2d 1291, 1301–02 & n.18 (1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852–53 (8th Cir. 1973). The instant case presents the analogous situation of an agency's failure to consider an alternative that is subject to the same or similar defects as another alternative it has explicitly considered and rejected.

Several of the Commission's reasons for rejecting across-the-board disclosure are equally apposite to the proxy disclosure alternative. The Commission concluded, for example, that investors—even "ethical" investors—were typically uninterested in the type of comprehensive disclosure advocated by appellees. 40 Fed.Reg. at 51662. It also voiced concern that the sheer bulk of disclosure documents would make them confusing to the average investor and would tend to obscure important information. *Id.* at 51660 & n.27. These are the type of predictive or legislative factual judgments as to which our review is necessarily circumscribed. We cannot, on this record, say that the Commission's conclusions on these questions were so unsound as to indicate a failure to fulfill the procedural NEPA duty of considering reasonably identifiable alternatives. Because these conclusions militate against proxy disclosure no less than against across-the-board disclosure, we are reluctant to require the Commission to engage in what would appear to be the futile exercise of considering the proxy alternative.

The Commission's other reasons for rejecting across-the-board disclosure strongly support this conclusion, although we recognize that they do not apply with precisely the same force to the proxy area. Proxy disclosure, for example, would involve less printing and processing costs, and would therefore impose a somewhat reduced burden on agencies and registrants. *See* 40 Fed.Reg. 51662. However, the principal burdens of comprehensive disclosure—preparing the disclosure materials, by the corporation, and evaluating their adequacy, by the agency—would not be significantly reduced in the case of proxy disclosure. Proxies, in addition, are not primarily designed to facilitate the type of inter-corporate comparisons that the SEC concluded were infeasible under appellees' comprehensive disclosure scheme. *See id.* Again, however, the Commission's reasoning militates against proxy disclosure to the extent that such materials are used in the investment community for inter-corporate comparisons.

Our third reason for not requiring the Commission to consider proxy disclosure is the fact that, several months after the District Court took the summary judgment motions in this case under advisement, the SEC announced a new set of proceedings.

The record does not show that these proceedings were brought to the attention of the District Court, but on appeal the SEC made a representation concerning them.[32] By its announcement of these new proceedings, the SEC has successfully invoked a principle, founded in administrative law generally and in the Supreme Court's NEPA decisions particularly, that it is not the judicial province to upset agency structuring of proceedings.

Traditionally, it is the agency, not the court, which determines whether to proceed by rulemaking, by individual adjudication, or by a combination of the two. *See, e. g. NAACP v. FPC*, 425 U.S. 662, 668, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Moreover, on remand, the court leaves "to the agency the methods, procedures, and time dimension of the needed inquiry . . . ." *FPC v. Transcontinental Gas Pipe Line Corp., supra,* 423 U.S. at 333, 96 S.Ct. at 583. And as a general rule, the agency, not the court, enlarges the minimum procedures prescribed by statute. *Vermont Yankee, supra.*

This division between the administrative and judicial provinces preserves a

**32.** Brief of the SEC at 65 n. 75 (emphasis supplied):

Moreover, the Commission is involved in an ongoing examination of the shareholder democracy process—an examination which is, of course, much broader than the matters involved herein. In Securities Exchange Act Release No. 13482 (Apr. 28, 1977), 42 Fed. Reg. 23901 (May 11, 1977), the Commission announced that it would hold public hearings concerning shareholder communications, shareholder participation in corporate electoral process and corporate governance.

Three of the issues being addressed are (Securities Exchange Act Release No. 34–13901 (Aug. 29, 1977) (footnote omitted)):

"(1) what types of socially significant matters, if any, are material (within the meaning of Rule 14a–9) to shareholders in making informed voting decisions? In this regard, is there a difference between information necessary to an informed voting decision and information necessary to an informed investment decision?

(2) whether or not information relating to *socially significant matters including matters relating to the environment and employment practices,* is material within the meaning of Rule 14a–9, would it be appropriate for the Commission to exercise its rulemaking authority under section 14(a) to require disclosure of such information in proxy statements and/or annual reports to shareholders?

\* \* \*

(7) what would be the costs and benefits of [the above]? Can these costs and benefits be quantified? If not, why?"

The Commission announced that, at the conclusion of these hearings, it would determine "whether it is necessary or appropriate in the public interest or for the protection of investors to propose amendments to Regulation 14A, to propose amendments to other applicable rules or to recommend legislation to Congress." Thus, *judicial review of the Commission's decision concerning proxy disclosure,* if such review may be appropriate, *lies properly in the context of the Commission's proceedings concerning that issue.*

sphere of discretion for the agency, which alone is cognizant of the many demands on it, its limited resources, and the most effective structuring and timing of proceedings to resolve those competing demands. An agency is allowed to be master of its own house, lest effective agency decisionmaking not occur in *any* proceeding; and judicial review awaits the agency's conclusion of its proceedings. *See Myers v. Bethelehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

Administrative discretion to structure agency proceedings influenced, if not dominated, the four major Supreme Court NEPA cases, for each has shown, in a different context, that judicial review of agency compliance with NEPA must be tempered by recognition that full compliance with NEPA must be measured against the agency's structuring of its proceedings. In *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), the Court upheld approval of a rate increase by the Interstate Commerce Commission on the ground that the ICC structured its proceedings so that the general rate increase proceeding was not the forum for full environmental consideration; the particular issue of most environmental concern, the rates on recyclable materials, belonged, rather, to another ICC proceeding. The ICC and the railroads, the Court said, "emphasize the fact that they [are] giving continuing and more extensive attention to environmental consequences flowing from the rate structure in another proceeding . . . which [is] more appropriate to the task. We substantially agree with this position." 422 U.S. at 322, 95 S.Ct. at 2357; *see also id.* at 325–26, 95 S.Ct. 2336. In *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Court upheld the Interior Department against a charge that it had failed to prepare an impact statement for regional development in the Northern Great Plains. The Court did so on the ground that the agency, not the courts, would structure the pattern of compliance with NEPA, and that the Department adequately complied with NEPA by preparing national and local impact statements rather than regional ones. 427 U.S. at 410–12, 96 S.Ct. 2718, citing *SCRAP,* 422 U.S. at 325–26, 95 S.Ct. 2336. In *Flint Ridge Development Co. v. Scenic Rivers Association,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), the Court upheld the Department of Housing and Urban Development, despite its failure to prepare an impact statement, noting that the opportunity remained for the agency to carry out the essentials of its NEPA duties in a further proceeding responding to a rulemaking petition, 426 U.S. at 792, 96 S.Ct. 2430. Finally, in *Vermont Yankee, supra,* the Court upheld a Nuclear Regulatory Commission licensing decision against charges by a utility that NRC had chosen the wrong proceeding to consider nuclear waste issues, 435 U.S. at 538–39, 98 S.Ct. 1197, citing with approval this court's discussion of why licensing proceedings were indeed appropriate for such consideration.

Deference to the SEC's decision to consider environmental disclosure in another proceeding is, in our view, appropriate. Our discussion of the scope of review of agency rulemaking shows that the quasi-legislative nature of rulemaking requires even greater agency freedom to manage and structure decisionmaking than is required in licensing or adjudication. Moreover, the record of this case shows that from 1971 to 1977, the SEC repeatedly stated intentions to continue its investigations and proceedings further—*e. g.,* when it sought dismissal of premature petitions for review in this court, when it abided by the District Court's first remand order, and when it sought extensions of time from the District Court to carry on its rulemaking. Each time, the SEC conducted further rulemaking proceedings which were more than *bona fide.* In our view, those renewed SEC proceedings were searching, intensive, productive of valuable new information and insight, and in accordance with all canons of procedural fairness. As the District Court observed, to this proceeding was devoted "a substantial, and perhaps even an unprecedented, amount of the Commission's time," *NRDC I, supra,* 432 F.Supp. at 1212.

The Commission's task has been a peculiarly difficult one, requiring it to find a path between the views of the parties to the rulemaking polarized in support of the broadest disclosure or in opposition to any disclosure, to interpret novel statutory commands, and to make decisions against the background of rapidly changing conditions in the realm of shareholder proposals. This court is mindful of the difficulty of agency decisionmaking in such contexts, and when an agency indicates a need for a further opportunity to study or act, in circumstances like this, we will generally accord its position considerable deference. *EDF v. Costle,* 188 U.S.App.D.C. 95, 578 F.2d 337 (1978).

**B.**

The District Court also faulted the SEC for failing to work "in consultation with the Council on Environmental Quality," section 102(2)(B) of NEPA, 42 U.S.C. 4332(2)(B), but instead, leaving to CEQ and the Environmental Protection Agency the task of considering or requiring disclosure. *NRDC II, supra,* 432 F.Supp. at 1207–08. This, again, is an objection to the SEC's procedural compliance with NEPA, as to which we exercise a relatively exacting review function. However, we cannot find the SEC in error on this issue, since we find it did indeed consult with CEQ to the extent required by NEPA.

CEQ was established to provide "objective and impartial advi[c]e as well as a long-range overview and problem identification function," S.Rep. No. 296, 91st Cong., 1st Sess. 16 (1969), and as the federal agency "ultimately responsible for administration of the NEPA and most familiar with

its requirements for Environmental Impact Statements," *Warm Springs Dam Task Force v. Gribble,* 417 U.S. 1301, 1310, 94 S.Ct. 2542, 2547, 41 L.Ed.2d 654 (1974) (Douglas, J., in chambers), CEQ's views on agency compliance *vel non* with NEPA receive attention in the courts. CEQ appeared twice in the SEC's proceedings and vigorously supported corporate environmental disclosure requirements.[33] It made the expert assessment that the SEC could overcome the difficulty "in trying to design environmental disclosure requirements which are both economical and responsive to the Nation's policies expressed in NEPA . . . *but not without some commitment by the SEC to expand its expertise* in order to develop, enforce, and interpret disclosure standards which force succinct articulation of corporate environmental performance." Ex. B at 238 (emphasis supplied).[34] It indicated its willingness to "provide whatever consultation and review might be useful to the Commission." Ex. B at 239; *see also id.* at 157.

The value of SEC consultation with CEQ is evident. To take a hypothetical example, Congress has recently passed new legislation concerning toxic substances,[35] and EPA has commenced several far-reaching regulatory programs with respect to air and water discharges of such substances. CEQ would be in a position to know if these legislative and administrative initiatives foreshadow a period in which corporations may not be in compliance with the law, or in which compliance with toxics regulation will have a significant economic impact on corporations, or in which action on toxics may be a controversial policy issue on which corporate managements can expect shareholder

33. Statement of May 14, 1975, Ex. B at 145–58; Statement of January 12, 1976, Ex. B at 234–39.

34. CEQ's advice was based on its familiarity with the difficulty other agencies have faced in complying with NEPA. The critical factor is often the willingness of the agency to spend the money to hire at least a few staff members trained in environmental matters. Absent a willingness to do so, an agency attempting to comply with NEPA will generally be exposed as unqualified and ineffectual, whatever its

track record in compliance with agency-specific mandates. *See generally* Tiefer, *NEPA and Energy Supply: A Case Study of the Effects of* Sierra Club v. Morton *on Coal Production in the Northern Great Plains* 6 (DNA Envir. Rep. Monograph No. 22, 1976).

35. *See* Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.;* §§ 42, 50, and 53 of the Clean Water Act of 1977, 91 Stat. 1582–83, 1588, 1589–60.

proposals. It would therefore be able to advise whether disclosure in such limited contexts is especially timely, and could supply drafts of proposed disclosure requirements.

However, even viewing the SEC's action in this proceeding in a critical light, we are unable to find its relationship with CEQ to be violative of NEPA. After CEQ made its proposal, the SEC gave it careful consideration, and articulated its basis for rejecting it in separate and specific detail. The SEC's view was that the comprehensive type of disclosure sought by CEQ was not restricted "to information which appears to be of interest to investors, but must [include also] disclosure which would be of interest to other persons and entities. For this reason, the Council's suggestion is not designed to, and would be unlikely to, produce information of the type which investors appear to be interested in." 41 Fed. Reg. at 21634. We cannot fault the SEC for insufficient consultation with CEQ on a proposal that lacked adequate grounding in the securities laws. Moreover, we assume that in the new proceedings concerned with proxy solicitation, CEQ will have the opportunities to offer its advice that it enjoyed in the instant proceedings, and by adjusting its proposals better to fit the intent of the securities laws and the needs of investors, it could provide that degree of assistance which the District Court considered a necessity for rational SEC rulemaking decisions. As for the isolated comment in the SEC's decision that gives the impression that it has shunted the task of requiring environmental disclosure to other agencies, 40 Fed. Reg. at 51662 n.44, we believe that the announcement of further SEC proceedings indicates an intention not to engage in such shunting at all. We are not disposed to overturn the SEC's decision merely because of isolated indications of reserve about appellees' proposed rules.

### C.

■ The District Court objected, thirdly and finally,[36] to the SEC's conclusion that

"both the costs to registrants and the administrative burdens involved in the proposed disclosure would be excessive. . . . It appears, therefore, that the proposed disclosures would be extremely voluminous, subjective and costly to all concerned." 40 Fed.Reg. at 51662. The District Court criticized this conclusion as not "supported by any underlying findings of fact" and suffering from a "total dearth of support." NRDC II, supra, 432 F.Supp. at 1206. This objection reflects a conclusion that the SEC's decision not to adopt rules was not sustainable on the administrative record. As we have seen, see Part II–C supra, a highly deferential scope of review is appropriate to such substantive issues. Given such review, we do not overrule the SEC for its quantification of the costs and benefits of environmental disclosure.

The simple fact is that the SEC could not be required to support a decision by factual proof. Even with respect to the SEC's financial disclosure requirements, which have been in effect for decades, there is still remarkably little hard data on costs and benefits, due to the inherent uncertainties in quantifying the net cost of gathering and disseminating information and in determining the benefit resulting therefrom. As one commentator recently stated in frustration, "[t]here is little direct evidence on the effect of required disclosure on the efficiency with which securities markets operate. I do not know of any measurements of the costs of securities analysis and choice that permits a comparison of the pre- and post-SEC periods." Benston, An Appraisal of the Costs and Benefits of Government-Required Disclosure: SEC and FTC Requirements, 41 Law & Contemp. Probs. No. 3, 30, 53 (1977).

The lack of data on which to estimate the costs and benefits of novel forms of disclosure is, naturally, even more striking. It is only recently that any general work in the

---

**36.** The court also alluded to various lesser flaws in the SEC's decision, 432 F.Supp. at 1208–09. We do not believe these are dispositive and do not find them to be a basis for concluding that the SEC's decision was arbitrary and capricious.

area has appeared at all and even it admits the current limitations on knowledge.[37] The only model for systematic agency-mandated corporate environmental assessment is apparently the requirement of the Federal Power Commission concerning reporting of environmental protection facilities and expenses by utilities. *See* 18 C.F.R. § 141.-1(d) (1978); 40 Fed.Reg. 57450 (Dec. 10, 1975). There is no clear relation between the FPC disclosure requirements and those in the proposals considered by the SEC, and it appears appellees did not attempt to develop information on the FPC disclosure requirements. Virtually no credible effort to quantify costs or benefits by any commenter in the record has been brought to our attention by counsel, nor have we found any in our own independent review of the record.[38]

The absence of firm data did not preclude the SEC from adopting or declining to adopt rules. Rather, it shows that the SEC was required to make a quasi-legislative policy judgment, much like the judgments made by Congress when it legislates in previously uncharted territory. In *Industrial Union Department, supra,* 162 U.S.App.D.C. at 338–39, 499 F.2d at 474–75, we upheld agency rulemaking in the absence of hard factual proof, based on a recognition that in some areas, such as mat-

ters "on the frontiers of scientific knowledge," *id.* 162 U.S.App.D.C. at 338, 499 F.2d at 474, agency rulemaking decisions must occur before such proof is available. Our approach in *Hodgson* has been expressly followed in numerous decisions of the courts of appeals.[39] Recently, the Supreme Court upheld a refusal by the FCC to adopt rules (concerning retroactive application of media ownership diversification requirements) on the *Hodgson* rationale:

> In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency," *FPC [Federal Power Commission] v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *see Industrial Union Dept., AFL–CIO v. Hodgson,* 162 U.S.App.D.C. 331, 338–339, 499 F.2d 467, 474–475 (1974).

*National Citizens Committee, supra,* 436 U.S. at 814, 98 S.Ct. at 2122.

Appellees point out that courts scrutinizing environmental impact statements have criticized agencies' failures adequately to ground their decisions in cost-benefit data,

---

37. American Institute of Certified Public Accountants, The Measurement of Corporate Social Performance (1977). The AICPA study may well be regarded, in time, as a harbinger of improved methods of social performance measurement and disclosure. Its conclusion, though, "is simultaneously optimistic and pessimistic. It is pessimistic about expectations that a social information system with even the relative purity of financial accounting systems will be developed in the foreseeable future, if ever. It is optimistic that much can be accomplished and that it will be useful." *Id.* at 11.

38. We have quoted the National Association of Manufacturers' $1 billion estimate. That estimate was ridiculed by appellees as exaggerating the disclosure requirements and cost by confusing NEPA requirements for federal agencies (with respect to impact statement preparation) with the far-different disclosure requirements of the proposed rules. On their side, however, plaintiffs presented no firmer evidence than the assessment by the Council on Economic Priorities, with its experience in

gathering information, that the "existence of companies with good disclosure records demonstrates that the costs of such disclosure is far from prohibitive." Ex. C at 564. The SEC's "failure" to quantify costs and benefits may be seen more as skepticism of the claims of both opponents and proponents of disclosure, rather than as reflecting an absence of consideration of the matter.

39. *See, e. g., Hercules, Inc. v. EPA,* 194 U.S. App.D.C. 172 at 187, 598 F.2d 91 at 106 (1978); *EDF v. Costle,* 188 U.S.App.D.C. 95, 97, 578 F.2d 337, 339 (1978); *American Iron & Steel Inst. v. OSHA,* 577 F.2d 825, 833–34 (3rd Cir. 1978); *Superior Oil Co. v. FERC,* 563 F.2d 191, 201 (5th Cir. 1977); *Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 392–401, 541 F.2d 1, 20–29 (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Society of the Plastics Indus., Inc. v. OSHA,* 509 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975).

see, e. g., *EDF v. Froehlke*, 473 F.2d 346, 352 (8th Cir. 1972). However, these decisions concerned situations in which past projects provided a base for quantified cost-benefit estimates. The present context is far more novel and speculative, and we are in no position to impose similar requirements in this case.

## IV.

Appellees also petitioned the SEC to promulgate new rules requiring disclosure of data concerning minority and female employment.[40] This information is of the kind most large corporations compile and report to the federal government on the Consolidated Employer Information Report EEO–1, a short form, commonly no more than two or three pages long, breaking down corporate employment statistics by race, sex, and job category.[41] The SEC's rules, of course, already required disclosure of "material" information, see, e. g., *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *id.* at 445–46, 96 S.Ct. 2126 n. 8. *See generally* Hewitt, *Developing Concepts of Materiality and Disclosure*, 32 Bus.Law 887 (1977).

Appellees and supporting commenters, notably EEOC, introduced considerable information about the value to stockholders of EEO–1 data. EEOC's two submissions

detailed the impact on corporations of non-compliance with the civil rights laws, and EEOC concluded by "emphasiz[ing] that employment discrimination has, in fact, a substantial potential impact on the financial well being of those utilizing the securities markets," Ex. C at 737, and that disclosure of EEO–1 data "gives a prudent observer substantial useful information," *id.* at 758. As the record reflects and as we have previously recognized, *NAACP v. FPC, supra,* 172 U.S.App.D.C. 32, 44, 520 F.2d at 444, the financial impact of employment discrimination can encompass many particular costs, such as backpay awards on discrimination claims and the loss of valuable government contracts terminated because of employment discrimination. The EEOC supplemented its own expert analysis of the financial impacts of discrimination, tangible and intangible, by citing the views of accountants, mutual funds, and financial reporting services which believe in checking corporate civil rights data.[42]

Appellees also supported their petition with evidence that EEO–1 data reflects on the worthiness of corporate management, and has been the subject of special interest by shareholders exercising proxies. Shareholders have frequently demanded EEO–1 data by submitting proposals for disclosure, and managements, with and without such demands, have increasingly revealed such data.[43] The National Organization for

---

**40.** Appellees also sought disclosure of employment discrimination suits. The considerations involved in such disclosure do not differ significantly from those involved in disclosure of EEO–1 data, and our discussion of EEO–1 data is intended to cover both requests.

**41.** EEO–1 forms must be submitted by sizable companies, and companies doing business with the federal government, to the Joint Reporting Committee for distribution to the Office of Federal Contract Compliance and the Equal Employment Opportunity Commission (EEOC). *See* Executive Order No. 11246, 30 Fed.Reg. 12319 (1965), *as amended,* Executive Order No. 11375, 32 Fed.Reg. 14303 (1967). A copy of a blank EEO–1 form is entered in the record, Ex. C at 809–10.

**42.** Ex. C at 765–66 (accountants), 783 (citing Investment Company Institute's report on Corporate Responsibility and Mutual Funds), and 762–63 (quoting Standard and Poor's invest-

ment report on company's "reserve for possible losses under a civil rights case.").

**43.** The considerable showing in the record includes extensive examinations of the EEO–1 disclosure by one corporation, General Electric Co., *see* Ex. C at 446 (comment by General Electric Co.), *id.* at 597–602 (reproducing Purcell, *How GE Measures Managers in Fair Employment,* 52 Harv.Bus.Rev. 99 (Nov.-Dec., 1974)); and a full collection of excerpts from annual reports, *id.* at 797–808 (compiled by the ACLU Fund of the National Capital Area). As a recent article summarized the trend, Schwartz & Weiss, 65 Geo.L.J. 635, 644–45 (1976) (footnotes omitted):

Prior to 1974, virtually no major corporations had released to the public statistical "EEO–1 data" requested in shareholder resolutions. Beginning in 1974, however, many prominent corporations began to release this information, in large part as a result of the

Women submitted a statement about the strong interest of its stockholding members and others in "information regarding possible sex-biased employment practices of companies in which they are investing or may invest," Ex. C at 519, and the EEOC observed that "[t]he failure to take necessary action to correct employment discrimination problems may be an indication to a least some investors that management may be deficient in other areas as well, with potential results not just measured by the cost of discrimination alone." Ex. C at 764.

Opponents of new rules governing disclosure of EEO-1 data raised a number of contrary considerations. They argued most strongly that the existing rule of requiring "material" disclosure, "with which there has been over 40 years of experience,"[44] provided adequate information for shareholders. It was further argued that the SEC should not require disclosure of EEO-1 data because of the confidentiality provision limiting disclosures of material filed with the EEOC.[45] It was also argued that there was a "lack of meaningfulness"[46] in EEO-1 data, because it requires further information and expert analysis fully to determine the extent of discrimination from such data.

In denying appellees' petition, the SEC expressly declined to rely on the confidentiality contention. While its rationale was somewhat obscured by dicta,[47] the SEC's first and principal ground was that the existing disclosure rule of "materiality" was adequate. The SEC asserted that

> [a]t the outset, it should be noted that the Commission's present disclosure requirements call for disclosure of certain equal employment matters. Rules adopted pursuant to the Securities Act and the Securities Exchange Act provide generally that in addition to the information expressly required to be included in registration statements and in reports, further material information, if any, must be included. . . . [W]e believe that our present materiality standards regarding legal proceedings provide adequate information to meet the needs of investors generally in this regard. . . . In specific cases, the failure to make appropriate disclosures could be actionable by the Commission, depending upon the appropriate exercise of the Commission's prosecutorial discretion.

40 Fed.Reg. at 51665, 51666.

As we understand the Commission's position, it did not dispute the contentions of the EEOC concerning the significance of EEO-1 data, which would have entailed

---

pressure generated by shareholder resolutions. In 1974, nine of the seventeen equal employment disclosure resolutions were withdrawn after the corporations agreed to disclose information that the sponsors of the resolutions considered adequate. Of the eight companies at whose annual meetings resolutions were brought to votes, all but one published some or all of the information requested, and in only two cases did the resolutions receive more than three percent of the votes cast. Somewhat fewer equal employment disclosure resolutions were submitted to corporations in 1975 and, on the whole, corporations responded to those resolutions more positively. Moreover, a number of corporations followed the lead of those that had disclosed EEO-1 data in 1974, even without the prod of shareholder proposals. By January 1976, an activist church group reported that some fifty major United States corporations, including General Motors, Ford, AT & T, General Electric, Exxon, Sears, IBM, and Xerox, had made public EEO-1-type data.

**44.** Ex. B at 140 (comment of Committee on Securities Regulation, Association of the Bar of the City of New York).

**45.** 40 Fed.Reg. at 51666 n. 73.

**46.** Ex. C at 633 (comment of Exxon Corp.).

**47.** The SEC referred to the many other proposals made to it concerning disclosure of controversial corporate conduct. 40 Fed.Reg. at 51666 n. 72. The District Court considered this extended list to be the SEC's basis for its decision and found the SEC arbitrary and capricious. NRDC II, supra, 432 F.Supp. at 1210–11. We regard the SEC's references as essentially irrelevant to the decision now on review. The SEC has given many indications that its actual position on requiring disclosure of controversial corporate conduct is different from that suggested by these comments, see e. g., Note, Disclosure of Payments to Foreign Government Officials Under the Securities Acts, 89 Harv.L.Rev. 1848 (1976). Accordingly, we look elsewhere in the Commission's statement for the true bases of its decision.

contradicting that agency in its area of expertise. Rather, and more subtly, the Commission's position is that if EEO–1 data is as significant as the rulemaking petitioners and the EEOC contend, then its disclosure is already required under existing rules. The precise working out of the particular EEO–1 data disclosure requirements could be left to case-by-case adjudication under those existing rules.

Moreover, the Commission indicated that its own enforcement efforts would be applied in this regard when appropriate. *Id.* at 51666. Counsel for the Commission maintained this position throughout the judicial proceedings. The District Court asked about disclosure of "an action under one of these civil rights statutes for damages against one of the registrants subject to your Commission's regulations," when that "action has merit." The SEC's General Counsel, appearing before the Court, responded that "[i]n the hypothetical Your Honor postulates if we assume that it would be [of interest to an investor], the answer is that it would be required to be disclosed under our existing rules . . . under our materiality standard." Ex. A at 146–47. On appeal, the SEC's General Counsel again stated that the SEC "would continue to elicit disclosure of such information in specific cases pursuant to its general requirement that all material information be disclosed. . . ." Brief for SEC at 67.

At the present time, the SEC has stated that it will approach the problem of appropriate disclosure of EEO–1 data outside the proxy context through adjudication rather than new rulemaking. In this regard, the Commission has also expressly noted that individuals may also institute litigation to seek disclosure of such data. 40 Fed.Reg. at 51666. The showing made in the record of this proceeding by appellees, far from undercutting the reasonableness of this approach, demonstrates its potential utility. Already, numerous companies have disclosed EEO–1 data, either voluntarily or on shareholder demand. The Commission's expressions in this case about its position may well spur further disclosure. We have con-

fidence in the Commission's representations as to its intention to proceed by adjudication in appropriate cases. Moreover, the Commission stated that it will "continue to reevaluate the need for such [new disclosure] requirements from time to time." 40 Fed.Reg. at 51667. The SEC may rationally choose to proceed by adjudication for a reasonable period of time, which will provide it with the experience enabling it to determine at a later date whether something other than a materiality rule is necessary or desirable for equal employment disclosure. Thus, especially given the narrow scope of our review of the SEC's decision not to adopt additional equal employment disclosure rules, we conclude that the Commission was wholly justified in rejecting the proposed rules and choosing, for the present, to rely on the existing materiality disclosure standard.

For the reasons stated above, we reverse the order of the District Court and remand with instructions to dismiss the complaint.

*So ordered.*