149 F.3d 429
 12 Communications Reg. (P&F) 1191
 CELLNET COMMUNICATIONS, INC., Petitioner,
Telecommunications Resellers Association, Intervenor,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
Airtouch Communications, Inc.; Rural Telecommunications
Group; GTE Service Corporation, Intervenors.
 No. 96-4022.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 12, 1998.
Decided July 7, 1998.
 
 Joel H. Levy (argued and briefed), Cohn & Marks, Washington, DC, for Cellnet Communications, Inc.
 Charles C. Hunter, Hunter & Mow, for Telecommunications Resellers Ass'n.
 John E. Ingle (briefed), William E. Kennard (briefed), Daniel M. Armstrong (briefed), Nancy L. Kiefer (argued and briefed), Office of the General Counsel, Federal Communications Commission, Washington, DC, for F.C.C.
 Cathrine G. O'Sullivan (briefed), Nancy C. Garrison (briefed), U.S. Department of Justice, Antitrust Division, Washington, DC, Janet Reno, U.S. Atty. Gen., U.S. Dept. of Justice, Washington, DC, for U.S.
 Kathleen M. Trafford, Porter, Wright, Morris & Arthur, Columbus, OH, for Airtouch Communications, Inc.
 Caressa D. Bennet, Gregory W. Whiteaker, Bennet & Bennet, Washington, DC, for Rural Telecommunications.
 Andre Lachance, Washington, DC, for GTE Service Corp.
 George L. Lyon, Jr. (Briefed), Lukas, McGowan, Nace & Gutierrez, Chartered, Washington, DC, for Concus Communications, Inc..
 Before: RYAN, COLE, and GILMAN, Circuit Judges.
 OPINION
 COLE, Circuit Judge.
 
 
 1
 The petitioner seeks review of a rule-making order in which the Federal Communications Commission ("FCC") extended its prohibition against restrictions on the resale of wireless mobile services, which had previously applied only to some cellular licensees, to certain other types of commercial mobile radio services providers. Resale involves buying services or facilities from facilities-based providers, the carriers who constructed and own the physical infrastructure involved in providing wireless services, and then reoffering communications services to the public for a profit. In the same order, the FCC included a sunset provision for this general prohibition against restrictions on resale at a date five years from the award of the last broadband personal communications licenses, so that the rule will no longer exist at that point for any category of wireless service.
 
 
 2
 The petitioner, Cellnet Communications, Inc. ("Cellnet"), a reseller of cellular services, challenges the sunsetting of the rule and urges us to reverse the FCC's order. The FCC defends its order by pointing to the developing competitive market of wireless services. The FCC contends that the rule may be properly sunsetted because the prohibition of resale restrictions will no longer be required to ensure some level of competition as competitive market forces will exist, thereby eliminating the need for the prohibition. The petitioner also complains about the adequacy of the FCC's public notice for the rule-making order.
 
 
 3
 Finally, the FCC contends that the amicus curiae to this appeal improperly presents a challenge to the FCC's decision not to impose resale obligations on narrowband personal communications services licensees. For the reasons that follow, we deny the petition for review.
 
 BACKGROUND
 
 4
 In the mid-1970s, the FCC set aside radio frequencies for the development of cellular telephone service. See Connecticut Dep't of Public Utility Control v. FCC, 78 F.3d 842, 845 (2d Cir.1996). Initially, the FCC anticipated licensing one cellular telephone system in each community, which would be operated by the local telephone company. See National Ass'n of Regulatory Utility Comm'rs v. FCC, 525 F.2d 630, 636-37 (D.C.Cir.1976). In the 1980s, however, in order to service increased demand and promote competition, the FCC decided to increase the spectrum allocation and, in each market, to divide the allocated spectrum among two competing "facilities-based" cellular carriers. Public Utility Control, 73 F.3d at 845. The FCC thereby created a "duopolistic" market structure for the cellular industry. To encourage an extra measure of competition and to combat price discrimination, the FCC prohibited the facilities-based carriers, which are the carriers who constructed and own the physical infrastructure involved in providing services, from restricting resale of their cellular capacity. See id. (citing Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1108 (D.C.Cir.1992)). Resale involves buying services or facilities from a facilities-based provider and then, after adding ancillary services or features, reoffering communications services to the public. For instance, a reseller might buy and package the wireless service with particular services and then sell the "package" to the public.
 
 
 5
 The FCC later created an exception to its cellular resale policy. In 1993, it decided that allowing a cellular carrier to deny resale capacity to a fully operational facilities-based competitor (defined as a carrier whose five-year build-out period has expired) would not violate certain statutory "reasonableness" standards. See In re Petitions for Rule Making Concerning Proposed Changes to the Commission's Cellular Resale Policies, 6 F.C.C.R. 1719, 1720-22 (1991) ("Cellular Resale NPRM and Order "), aff'd sub nom., Cellnet Communication, 965 F.2d 1106; see also 47 U.S.C. §§ 201(b), 202(a) (reasonableness standards).
 
 
 6
 As part of the Omnibus Budget Reconciliation Act of 1993 ("OBRA"), Pub.L. No. 103-66, 107 Stat. 312 (1993) (codified in relevant part at 47 U.S.C. § 332 (Supp. V 1993)), Congress amended the Communications Act of 1934 to dramatically revise the regulation of the wireless telecommunications industry, of which cellular telephone service is a part. Prior to 1993, the FCC had distinguished between common carrier service and private carrier service and had regulated the former to a much greater degree than the latter. Public Utility Control, 78 F.3d at 845. The 1993 OBRA amendments accomplished several changes. First, Congress amended the Communications Act to create two categories of mobile service: "commercial" and "private" mobile radio services (respectively, "CMRS" and "PMRS"). See Chadmoore Communications, Inc. v. FCC, 113 F.3d 235, 237 (D.C.Cir.1997). Congress directed the FCC to implement these categories in its regulations and provide for comparable regulation of substantially similar CMRS systems. Id. (citing 47 U.S.C. § 332). CMRS includes all mobile services operated for profit that solicit for subscribers and are interconnected with the public switched network, which is the traditional land-line telephone service.[1] See 47 U.S.C. §§ 332(d)(1) & (2). PMRS includes all wireless services that do not meet the definition for CMRS. 47 U.S.C. § 332(d)(3). The OBRA amendments also furnished the FCC with the authority to auction licenses for use of the spectrum, see OBRA § 6002(a), 107 Stat. §§ 387-92, and required the FCC to issue licenses for personal communications services, 47 U.S.C. § 332(c)(1)(D).
 
 
 7
 In the order under review, the FCC extended the rule prohibiting restrictions on resale so that broadband personal communications services ("PCS") and certain wide-area specialized mobile radio ("SMR") carriers must also allow unrestricted resale of their services; the rule previously applied only to certain cellular providers. See 47 C.F.R. § 20.12(b)[2]; 47 C.F.R. § 22.901(e) (former resale rule). SMR are commercially operated private communications systems that employ mobile transmitting and/or receiving stations. Chadmoore, 113 F.3d at 237. Such systems were originally used primarily to provide highly localized services, such as the radio dispatching of police cars and taxicabs. Id.; Cincinnati Bell Tel. Co. v. FCC, 69 F.3d 752, 756 (6th Cir.1995). In recent years, however, emerging SMR technologies have enabled licensees to offer their customers sophisticated voice and data transmission services over extensive areas (e.g., two-way acknowledgment paging, credit card authorization, automatic vehicle location, remote database access, and voice mail). Id. The FCC has allocated fourteen megahertz ("MHz") of spectrum[3] in the 800 MHz band exclusively to SMR systems. Chadmoore, 113 F.3d at 237. Allowing SMR providers to aggregate spectrum has enabled them to produce more sophisticated mobile communications services, see Cincinnati Bell, 69 F.3d at 756 & n. 1, and become a viable competitor with cellular technology. As explained below, SMR systems operate by digital technology, which appears to be technologically competitive with cellular technology's analog protocol.
 
 
 8
 The FCC has also designated a range of radio frequencies to be used in providing the new broadband PCS, another wireless communications technology that is expected to compete with existing wireless telephone services. See Omnipoint Corp. v. FCC, 78 F.3d 620, 626 (D.C.Cir.1996); Cincinnati Bell, 69 F.3d at 756. Like mobile satellite services, it is a technology with advantages that will allow it to compete effectively with cellular service providers. Its service relies on digital technology, rather than the analog data technique employed by cellular service providers. See Sprint Spectrum L.P. v. Jefferson County, 968 F.Supp. 1457, 1460 (N.D.Ala.1997). Most authorities agree that digital technology is an advance in communication and information-processing services. See, e.g., Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe, 957 F.Supp. 1230, 1238 (D.N.M.1997). Broadband PCS is not alone in its reliance on this technology. The previously mentioned SMR services, the original "dispatch" service, also operates with digital technology and is another category of service subject to the prohibition's extension and sunsetting. Because those providers have been allowed to, as mentioned, aggregate spectrum, see n. 3 supra, they are now becoming able to provide services previously impossible which are competitive with cellular and broadband PCS systems. See Chadmoore, 113 F.3d at 238.[4]
 
 
 9
 To review, there are emerging technologies which will and do provide services to the public akin to cellular service, i.e., a mobile telephone, but by other technologies. Among the relevant services on the mobile wireless landscape is "cellular," which provides services commonly associated with mobile telephone operations. See Cincinnati Bell, 69 F.3d at 756. There is SMR, a digital, wireless service with its origins in dispatch service and also broadband PCS, a service resembling cellular service but accomplished via digital technology.[5]
 
 
 10
 Currently, as mentioned, two cellular providers hold licenses in each geographic region and compete for wireless communications customers within that region. The new PCS is expected to compete almost immediately with cellular service in providing wireless communications in each geographic region. Id. In extending the rule at issue, the FCC explained that it did not extend the resale requirement to all CMRS providers because (1) it concluded that only cellular, broadband PCS and wide-area SMR licensees are likely to compete for two-way switched voice service customers, and (2) because resale is an established practice with most other CMRS licensees and competition appears to be vigorous. The rule will "sunset" five years after the FCC completes licensing the broadband PCS spectrum allocated so far because, the FCC explains, it expects that the availability of numerous facility-based suppliers of wireless services will make the resale rule unnecessary by that time. The resale rule will then no longer exist for any category of wireless service. At that time, carriers may deny their services to entities which propose to resell the service.
 
 Proceedings Below
 
 11
 In July 1994, the FCC issued the notice of inquiry which was the genesis of the current legal action in that it began the underlying FCC proceedings. See Notice of Proposed Rule Making and Notice of Inquiry, Equal Access and Interconnection Obligations Pertaining to Commercial Mobile Radio Services, 9 F.C.C.R. 5408 (1994) ("First Notice of Inquiry "). In April 1995, the FCC released its Second Notice of Proposed Rule Making, Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services, 10 F.C.C.R. 10666 (1995) ("Second NPRM "). On July 12, 1996, the FCC issued the order before this panel. See First Report and Order, Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services, 11 F.C.C.R. 18455 (July 12, 1996) ("CMRS Resale Order "). In that order, the FCC temporarily extended the resale rule to certain other CMRS licensees in addition to the already subject cellular licensees, so that it now covers broadband PCS and certain SMR providers as well. The FCC declined to impose any resale obligations on narrowband PCS licensees, a category of PCS that offers advanced paging and messaging services, see Nicholas W. Allard, Reinventing Competition, 17 Hastings Comm. & Ent. L.J. 473, 482 (1995), or on air-to-ground providers. Additionally, the FCC decided to sunset the rule with respect to all CMRS licensees, which includes cellular licensees, five years after the last initial licenses for broadband PCS are awarded.
 
 
 12
 In its order, the FCC explained that it based its decision on the state of competition in the market for CMRS services. The FCC concluded that "under current market conditions, restrictions on resale by cellular, broadband [PCS], and certain [SMR] providers will inhibit the development of competition in these services." CMRS Resale Order at 2. The FCC therefore declared in its rule that these carriers "must permit unrestricted resale of service." See 47 C.F.R. § 20.12(b) (codifying requirement as regulation). With respect to the application of the rule to other types of CMRS providers, such as narrowband PCS, the FCC concluded that the markets served by those carriers were already sufficiently competitive so that mandatory resale was not needed. It accordingly declined to adopt the rule with respect to CMRS providers other than cellular, broadband PCS and certain SMR providers.
 
 
 13
 The FCC further concluded that a five-year sunset provision was appropriate because "once broadband PCS licensees have built out their networks and are competing with cellular carriers, market forces will eliminate the need for explicit resale regulation." CMRS Resale Order at 2. Reviewing its resale policy, the FCC noted that "[t]he common theme underlying the benefits to be obtained from a resale rule is that they are most prominent in markets that have not achieved full competition." Id. at 8. The FCC recognized that such benefits diminish as the CMRS markets become more competitive. Id. at 9. At that point, the FCC reasoned, the costs of the resale rule would come to outweigh its benefits and the rule should no longer be imposed. Id. The commencement of the five-year sunset period will be triggered by a public notice issued after the FCC awards the last group of initial licenses for currently allocated broadband PCS spectrum. Id. at 14-15.
 
 
 14
 The petitioner Cellnet participated as a commenting party in the proceeding below. It now seeks review and reversal of the FCC's order. Cellnet, a reseller of cellular services, challenges only the sunsetting of the rule. It argues for reversal on the following grounds: (1) that the FCC's decision was arbitrary and capricious in that it departed from its own established obligation for wireless providers to provide service to the public "indifferently"; (2) that the decision was arbitrary and capricious in that the FCC lacked an adequate basis in the record for its "administrative costs" justification; (3) that the FCC lacked an adequate basis in the record on which to base its predictive judgment that future competition would not justify continued imposition of the rule; and (4) that the agency failed to provide adequate notice of the rule-making. The FCC asserts two additional issues: (1) that the petitioner procedurally defaulted the notice issue by not raising it to the FCC in a petition for rehearing; and (2) that the amicus curiae to this appeal exceeded its proper scope of argument.
 
 JURISDICTION
 
 15
 We have jurisdiction to review the FCC's final orders pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(a). Parties who have not been a party to the proceeding below must petition the FCC for reconsideration of an order prior to seeking review in this court. See 47 U.S.C. § 405(a).
 
 DISCUSSION
 A. Departure from Established Principles
 
 16
 Cellnet contends that the FCC's decision to sunset its rule violated its establishment of a common carrier's obligation to serve the public indifferently, and in so doing, represented an arbitrary and capricious decision. We may set aside an agency's rule only if it is arbitrary, capricious, abusive of discretion or otherwise not in accordance with law. Cincinnati Bell Tel. Co. v. FCC, 69 F.3d 752, 758 (6th Cir.1995) (citing 5 U.S.C. § 706(2)(A)).
 
 
 17
 Cellnet argues that for over twenty years the FCC has consistently applied to telecommunications common carriers the basic principle that their services must be offered without regard to the status of the customer and without restrictions on services which are privately beneficial and not publicly detrimental. Cellnet relies on a D.C. Circuit decision, Hush-A-Phone Corp. v. United States, 238 F.2d 266 (D.C.Cir.1956), as the source of the articulation of the public's right to unrestricted non-detrimental use of common carrier telecommunications services. It also cites Hush-A-Phone as the basis of the FCC's establishment of its first resale policy for private line service. The petitioner identifies as the essence of the FCC's justification for its evolving resale policies a customer's right to use a selected service without interference from the carrier selling the service. Cellnet then extrapolates from that principle to the situation at hand, contending that limiting the customers of cellular providers, such as the petitioner, to dealing only with a facilities-based carrier despite the benefits a reseller may be able to provide to customers, is in violation of the established principle articulated in Hush-A-Phone.
 
 
 18
 The FCC responds that there is no common carrier obligation to allow resale of services. It cites the statutory requirements that carriers are subject to: that they must engage in just and reasonable practices and that their practices cannot be unjustly or unreasonably discriminatory. See 47 U.S.C. §§ 201(b) & 202(a).[6] It also cites the fact that Congress's 1996 amendments to the Communications Act created a resale requirement for "local exchange carriers" and left to the FCC's discretion to decide if any CMRS providers should be defined as "local exchange carriers." Given such, the FCC argues, there is no well-established requirement that carriers resell their services as outlined by the petitioner.
 
 
 19
 The FCC also responds to Cellnet's argument that judicial and FCC precedent applying §§ 201(b) and 202(a) entitles it as a matter of law to use the services of CMRS licensees for any "privately beneficial" purpose unless such use is demonstrated to result in "public detriment." The FCC asserts that the authorities cited by Cellnet do not support such a narrow view of the FCC's discretion under §§ 201 and 202 and that Cellnet exaggerates the reach of the D.C. Circuit's holding in Hush-A-Phone. It characterizes the decision as concerning the reasonableness of a telephone company's restrictions on a subscriber's use of a telephone instrument devoted to a subscriber's private use. In the FCC's view of the D.C. Circuit's decision in Hush-A-Phone, the court's holding that the tariffed prohibition on "foreign attachments" was "neither just or reasonable" under § 201(b) does not translate to, as Cellnet argues, a conclusion that subscribers are entitled to resell a carrier's services. The FCC also contends that Hush-A-Phone did not establish any type of "public detriment/private benefit" analysis as the universal test for the FCC's determination of what is "just and reasonable" under § 201(b). The FCC characterizes as meritless Cellnet's contention that the FCC's reliance on Hush-A-Phone in its early resale decisions created a subscriber's right to be free from restrictions on resale so long as there was no concrete "public detriment." Because this contention is meritless, the FCC argues, Cellnet's identification of the use of cost-benefit analysis as an arbitrary departure from such an "established" subscriber's right is also meritless. The FCC points out that it used a cost-benefit analysis to eliminate the resale requirement between facilities-based cellular providers when it determined that such a limitation on the resale rule was just and reasonable under § 201(b). See Cellular Resale NPRM and Order, 7 F.C.C.R. at 4008. In that same decision, the FCC found that the exception to the general cellular resale rule would not violate § 202(a) because it was justified in light of the goal of stimulating interbrand competition and promoting more efficient use of the cellular radio spectrum. Id. The FCC acknowledges that it performed a "public detriment" analysis as part of its consideration of restrictions on resale in earlier decisions, but asserts that such is not a required step in its rule-making.
 
 
 20
 Finally, the FCC contends that its resale policy is not guided by a rigid interpretation of §§ 201 and 202. Rather than being guided by some absolute right, it is guided by a policy goal of opening up monopoly and duopoly markets to competition. The FCC explains that its determinations in the past that resale restrictions were unlawful have been case-by-case determinations depending on markets and the particular effects of resale restrictions. The FCC argues that, contrary to Cellnet's position, it did not forbear from enforcing §§ 201 and 202; to the contrary, the FCC made clear that its sunsetting did not "relieve CMRS providers of any portion of their statutory obligation under sections 201(b) and 202(a) of the Act, nor ... determine that any resale practice is just and reasonable per se." CMRS Resale Order at 14.
 
 
 21
 We agree with the FCC that Cellnet's arguments are meritless. We reject the notion that the Hush-A-Phone decision set out a "public detriment/private benefit" test for FCC action. In that decision, the D.C. Circuit determined that the tariff at issue was neither just nor reasonable under §§ 201 and 202 because it was an unwarranted interference with a person's use of their own telephone. The justness and reasonableness requirements set out in §§ 201 and 202 remain the criteria for FCC action. Thus, the Hush-A-Phone decision neither set forth other, more restrictive principles, nor did it recognize the existence of a customer's right to resell services as long as such was not publicly detrimental. Accordingly, we do not regard the order under review as an arbitrary departure. See Cellular Resale NPRM and Order, 6 F.C.C.R. at 1720-22 (deciding that cellular carriers may deny resale capacity to fully operational facilities-based competitors on the basis that such would not violate the standards of § 201(b) and § 202(a)), aff'd sub nom., Cellnet Communication, Inc. v. FCC, 965 F.2d 1106 (D.C.Cir.1992). In its order, the FCC determined that the continuation of the resale rule would no longer be needed to ensure that providers' practices were just, reasonable and not unreasonably discriminatory under §§ 201 and 202; it determined that the developing competitive market would ensure the reasonableness of carriers' practices. We also decline to characterize the FCC's decision as arbitrary, capricious or not in accordance with law in light of Congress's directive to the FCC that it consider the competitive effect of its regulations and that it must "forbear from applying any regulation ... if the Commission determines that enforcement of such regulation or provision is not necessary to ensure that [carriers' practices or regulations] are just and reasonable and are not unjustly or unreasonably discriminatory," 47 U.S.C. § 160(a)(1) (1996).[7]
 
 B. Administrative Costs
 
 22
 Cellnet next contends that the FCC's decision to sunset its resale rule was arbitrary and capricious or not in accordance with law in its reliance on "administrative costs." As already mentioned, we may set aside an agency's rule only if it is arbitrary, capricious, abusive of discretion or otherwise not in accordance with law.[8] Cincinnati Bell, 69 F.3d at 758 (citing 5 U.S.C. § 706(2)(A)). In making our determination, we consider whether the agency has considered the relevant factors involved and whether there has been a clear error in judgment. Id. The agency must have articulated a rational connection, i.e., supporting reasons, between its fact findings and its action. Id.
 
 
 23
 The petitioner contends that the FCC relied on "administrative costs" to make its rule and that such was not supported by adequate evidence or analysis, so that we should reverse the FCC's order. In its order, the FCC stated that the rule, "like all regulation, necessarily implicates costs, including administrative costs, which should not be imposed unless clearly warranted." CMRS Resale Order at 9. Cellnet complains that the FCC did not make clear whether its reference to administrative costs was to industry or government administrative costs. It further contends that the FCC received no data and provided no specific evidence or studies regarding the size of such administrative costs. It additionally complains that the FCC did not show how the general proposition regarding administrative costs was relevant to the issue of access to resale.
 
 
 24
 Cellnet goes on to argue that even if the consideration of administrative costs was appropriate, the FCC failed to explain why the costs of regulation prohibiting restrictions on resale are different from the costs involved in the FCC's general obligation to ensure that CMRS subscribers obtain reasonable and nondiscriminatory rates and are free of illegal practices and classifications (under §§ 201 and 202 of the Communications Act). The petitioner contends that the FCC's rationale is illogical because, in its view, the two activities are indistinguishable, but yet, to the FCC, the unknown costs involved in policing the prohibition on resale restrictions were significant and intolerable.
 
 
 25
 Cellnet also points to a statement by the FCC at an earlier stage in the proceedings that the extension of the resale requirement to other CMRS providers "would involve minimal expense and technical problems for most of the CMRS licensees subject to the requirement." Second NPRM, 10 F.C.C.R. at 10708. Cellnet contends that the lack of an explanation accounting for this earlier statement should raise questions.
 
 
 26
 The FCC responds that Cellnet's arguments relating to administrative costs are simply another version of its contention that the FCC must demonstrate that resale causes "public detriment" before it may allow carriers to refuse resale. The FCC explains that it considered the costs of the resale rule relative to the rule's diminishing benefits as the market becomes competitive, CMRS Resale Order at 9, and that evidence in the record supports the FCC's conclusion that the benefits of the resale rule diminish as competition increases. See, e.g., id. at 13 & n. 61 (noting that in markets for CMRS other than cellular, broadband PCS, or covered SMR services, "competitive conditions render a resale rule an unnecessary burden" because "the record suggests that resale is an established practice, competition appears to be vigorous, and there is no evidence that such providers are unreasonably restricting resale"). The FCC asserts that the record also contains evidence supporting the FCC's conclusion that the resale rule involves costs "which should not be imposed unless clearly warranted." CMRS Resale Order at 9. The FCC cites commenting parties' statements regarding the negative impacts of such a rule on the availability of service and discouragement of investment in new technology as well as a study's general conclusion that government regulation of market entry imposes costs on industry and consumers.
 
 
 27
 The FCC concludes that such a basis in the record allowed it to reasonably determine that the benefits available from the resale rule's application to cellular licensees and their competitors, broadband PCS licensees and covered SMR providers, when balanced against costs, were sufficient to justify extending and retaining the rule for the five-year time period; it explained that until competitors are able to establish themselves, the justifications for resale remain. The FCC also asserts that it could reasonably conclude that competitive development in the market will obviate the need for the rule, as the costs will come to outweigh the benefits of the rule. It reasoned that as markets become more competitive, the benefits of a resale rule diminish because carriers have less opportunity to restrict resale. Accordingly, the FCC reasoned, without much in the way of benefits, the rule's costs will exceed its benefits.
 
 
 28
 The FCC also addresses Cellnet's argument regarding the industry-versus-agency nature of the enforcement costs. It contends that the discussion of costs in the order indicates that the FCC was relying on costs to the industry and consumers, and to the extent that its decision also relies on the FCC's own administrative costs, the FCC's decision may take that into account.
 
 
 29
 The FCC also asserts that Cellnet is inaccurate in claiming that the FCC changed its position without justification between the Second NPRM and the final CMRS Resale Order, pointing out that the FCC justified the rule change on the basis that the original rationale for the rule had eroded and that the costs of the rule, including administrative costs to the industry, would come to outweigh its benefits.
 
 
 30
 Cellnet's argument on this issue is unavailing. At one point in its order, the FCC referenced the administrative costs that accompany regulation, commenting that resulting administrative costs should not be imposed "unless clearly warranted." Such reasoning was not an arbitrary or capricious basis for the FCC's decision nor was it not in accordance with law. The consideration of administration costs is a natural component to the consideration of competition and the effect of the proposed rule on the relevant markets. In addition, in light of the fact that such consideration is mandated by statute, see 47 U.S.C. § 160(a)-(b), it is certainly not arbitrary, capricious or abusive of the FCC's discretion to have considered such in formulating its rule. Finally, the FCC determined, relying on commenting parties' statements, a study of governmental regulation of market entry, and observations of other CMRS markets, that there will be no identifiable benefits from a continuation of the resale rule in the face of a competitive market five years hence, and thus any costs are excessive and not justified in light of a cost-benefit analysis. Such a conclusion is not so arbitrary and capricious as to warrant reversal.
 
 C. Predictive Judgment
 
 31
 Cellnet contends that the FCC did not have an adequate basis in the record for its predictive judgment that CMRS markets will be competitive in five years. As already mentioned, we may set aside an agency's rule only if it is arbitrary, capricious, abusive of discretion or otherwise not in accordance with law. Cincinnati Bell Tel. Co., 69 F.3d at 758. In making its determination, we consider whether the agency has considered the relevant factors involved and whether there has been a clear error in judgment. Id. The agency must have articulated a rational connection, i.e., supporting reasons, between its fact findings and its action. Id.
 
 
 32
 The petitioner argues that the FCC's "predictive judgment" about the state of competition among CMRS providers in five years is fatally flawed. It contends that the FCC did not cite any statutory authority for its consideration of the state of competition now or in five years as a reason for terminating its prohibition of resale restrictions, and that in actuality the statutory scheme is to the contrary.
 
 
 33
 The petitioner also characterizes the FCC's predictive judgment as an illegitimate basis for its order because, while it admits that the FCC has some latitude in making policies based on its judgments and predictions, it contends that the FCC's judgment was not based on logic or evidence in the record. It points to the fact that the FCC's rules do not assure that the majority of the public will have access to PCS service within five years after the issuance of the initial licenses; the FCC's licensing rules require only that PCS licensees with 30 MHz of spectrum reach one-third of their service area populations within five years of their license's issuance, and that PCS licensees with 10 MHz of spectrum must only serve one-quarter of the population within five years or failing that, "make a showing of substantial service." See 47 C.F.R. § 24.203. Cellnet explains that within five years of the PCS licenses' issuance, the FCC's rules do not guarantee that any more than one-third of the population will have access to PCS competitors.
 
 
 34
 Cellnet also points to an absence of evidence in the record to support the FCC's prediction of competition among PCS providers and cellular providers. In establishing the allocation scheme, the petitioner explains, the FCC acknowledged that many PCS licensees, particularly those with 10 MHz of spectrum, might merely provide "niche" services or augment services currently provided by the cellular carriers. See Amendment of the Commission's Rules to Establish New Personal Communications Services, 9 F.C.C.R. 4957, 5981 (1994). Cellnet accordingly argues that there is no basis for the FCC to assume that the issuance of PCS licenses in any particular geographic area will necessarily result in PCS providers vigorously competing with existing cellular carriers. Cellnet also points out that PCS is still in the early stages of its development and thus there is no track record to predict how markets will develop. The petitioner suggests that the FCC's prediction is revealed to be further flawed by the fact that PCS licensees will incur billions in capital costs for their licenses and infrastructure, a burden which the FCC has acknowledged may result in disaggregation of spectrum, which would enhance the number of niche competitors and decrease the number of competitors providing nationwide mobile communications services comparable to that of existing cellular providers. See Geographical Partitioning and Spectrum Disaggregation by Commercial Mobile Radio Service Licensees, 11 F.C.C.R. 10187 (1996) (notice of proposed rule-making). The petitioner asserts that until there is competition, cellular carriers and PCS licensees (as well as other CMRS carriers) have incentives to restrict resale of their service. It further contends that if the development of competition does not eliminate the carriers' incentive to prohibit resale, then the FCC lacks a basis for sunsetting the resale rule; if, on the other hand, more competition does eliminate the carrier's incentive to prohibit resale, the retention of the policy will not impose any costs on carriers.
 
 
 35
 The FCC contends that its determination that by the end of the five-year transitional period there will be sufficient facilities-based competition in the market for cellular-competitive services to render mandatory resale unnecessary is reasonable and thus entitled to our deference. It asserts that its decision rests on a forecast of the direction of public interest which necessarily involves the agency's expertise, and thus complete factual support in the record is not necessary or possible. The FCC points out that PCS has been historically regarded as a competitive contender for cellular service and that at the time of its order, it noted that some broadband PCS providers were already competing with cellular carriers where they had begun service and that they would begin nationwide service in the near future. In addition, the FCC points to the fact that private entities have bid and paid significant sums for PCS licenses and that such providers thus have an incentive to establish viable entities. It also points out that in the FCC's report to Congress on the state of competition in the CMRS market, it reported that cellular providers, in anticipation of PCS, were lowering prices and investing in digital technology. See First Competition Report, 10 F.C.C.R. at 8851-52 & n. 34. The FCC goes on to point to recent indicators that its predictions are being borne out.
 
 
 36
 The FCC dismisses the fact that the FCC's rules require PCS licensees to reach only one-third of the population in their service area within five years. It points out that because many PCS licensees paid significant sums for their license, they have incentives to build out their systems quickly. See Geographic Partitioning and Spectrum Disaggregation by Commercial Mobile Radio Services Licensees, 11 F.C.C.R. 10187, 10197 (1996) (noting that "many broadband PCS licensees may meet their five-year construction obligations early"). It also disputes Cellnet's implicit assertion that some of the PCS licensees may only be able to provide niche services. It argues that Cellnet's claim that there will not be that many PCS licensees in each market does not address the rationale behind the sunset rule, which is the sufficiency of competition in the market for cellular-like services. The existence of niches will not undermine the FCC's goal of competition with cellular licensees. The FCC notes that any disaggregation that may occur will encourage competition and that it already noted such in an earlier unrelated report; additionally, disaggregation agreements remain subject to the FCC's review.
 
 
 37
 Cellnet's argument on this issue fails. As the FCC's judgment is a predictive one, it cannot necessarily be proven by the record. It is well-established that under the arbitrary and capricious standard of review, an agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review. Milk Industry Foundation v. Glickman, 132 F.3d 1467, 1478 (D.C.Cir.1998); Franklin Savings Ass'n v. Director, Office of Thrift Supervision, 934 F.2d 1127, 1147-48 (10th Cir.1991); Aeronautical Radio, Inc. v. FCC, 928 F.2d 428, 445 (D.C.Cir.1991); Western Fuels-Ill., Inc. v. Interstate Commerce Comm'n, 878 F.2d 1025, 1030 (7th Cir.1989). This deference has been explained as deriving from the fact that such judgments tend to be infused with policy considerations that are not appropriate for close judicial scrutiny. See, e.g., Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1052 (D.C.Cir.1979). While we must be particularly deferential when reviewing such predictive judgments, such judgments are of course not unimpeachable. International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 821 (D.C.Cir.1983). An agency must still engage in reasoned decision-making, although predictive judgments may often involve "dramatic departures from longstanding policy." Id. at 822.
 
 
 38
 The petitioner has a fundamental misconception as the premise for its challenge. The FCC did not adopt its resale policy for the purpose of ensuring the availability of resale. It adopted the policy as a means to achieve competition; Cellnet has confused the means and ends the FCC had in mind. The question of whether lifting the resale prohibition would offer the public the benefits of competition implicates the FCC's expertise. The agency's predictive judgment on this point is certainly not arbitrary or capricious given the accepted fact that broadband PCS will offer wireless services competitive with cellular services and that five years is the standard build-out time period for broadband PCS licensees, see 47 C.F.R. § 24.203 (requiring PCS licensees to build out networks within five years of being licensed). See, e.g., Western Fuels, 878 F.2d at 1030 (noting that predictions about price disclosure are within ICC's area of expertise and accordingly giving due deference to its predictive judgment regarding such); Natural Resources Defense Council, 606 F.2d at 1052 (identifying as within the SEC's area of expertise the probable burden on corporations of complying with proposed rules and the likelihood that a proposed disclosure rule would produce particular corporate policies and noting court's deference for agency's deductions in these areas). Because five years is the required build-out time frame, the FCC expects that cellular carriers will not possess sufficient market power at that time to enable them to impose unreasonable restrictions on resale and stifle the competition of resellers. If the FCC's predictions about the level of competition do not materialize, then it will of course need to reconsider its sunsetting provision in accordance with its continuing obligation to practice reasoned decision-making. See, e.g., Aeronautical Radio, 928 F.2d at 445 (noting such a possibility of reconsideration in context of declining to set aside a FCC rule based on a predictive judgment).
 
 D. Notice
 
 39
 The petitioner contends that the FCC failed to provide adequate notice pursuant to the Administrative Procedure Act which requires a rule-making notice to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." See 5 U.S.C. § 553(b) (1994). Cellnet contends that the Notice of Inquiry and Second NPRM in the proceedings below did not adequately inform interested parties, such as the petitioner, that the FCC was contemplating the sunset of the resale rule as applied to all cellular providers. We must first consider the FCC's argument that Cellnet waived its objection to the adequacy of the FCC's rule making notice by not raising it to the FCC in a petition for rehearing. We review de novo the question of a waiver in agency proceedings. See Cordrey v. Euckert, 917 F.2d 1460, 1465 (6th Cir.1990).
 
 
 40
 The FCC contends that the petitioner is procedurally barred from raising its assertion of error as to the FCC's notice because § 405 of the Communications Act precludes judicial review of a claim not previously raised to the FCC. See 47 U.S.C. § 405(a). Cellnet responds with a Second Circuit decision which suggests that this court may consider the notice issue if no novel factual issue is raised or if the claim raises a legal issue on which courts have already made known their general view to the contrary. See National Black Media Coalition v. FCC, 791 F.2d 1016, 1021 (2d Cir.1986). It contends that in this case the agency's views would not aid our resolution of the notice question. It also asserts that the goals of § 405 would not be undermined by this court's consideration of the issue despite Cellnet's failure to raise the issue to the FCC.
 
 
 41
 Cellnet's assertion of error is barred. Section 405(a) provides, in relevant part, as follows.
 
 
 42
 The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any ... order ... except where the party seeking such review ... relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass.
 
 
 43
 47 U.S.C. § 405(a). It is well-established that issues not presented to an agency may be deemed waived on subsequent judicial review. See, e.g., James v. Chater, 96 F.3d 1341, 1342 (10th Cir.1996); Chipman v. Shalala, 90 F.3d 421, 423 (10th Cir.1996) (citing cases). "Procedural objections under the APA are precisely the sort of issues appropriately raised before the Commission in the first instance." City of Brookings Municipal Tel. Co. v. FCC, 822 F.2d 1153, 1163 (D.C.Cir.1987) (declining to review petitioner's claim that APA notice was inadequate). Section 405 dictates that factual and legal issues be presented to the FCC prior to this court's judicial review of issues. As the D.C. Circuit has explained, "[t]he very purpose of [section 405] is to afford the Commission the initial opportunity to correct errors in its decision or the proceeding leading to decision." Action for Children's Television v. FCC, 906 F.2d 752, 755 (D.C.Cir.1990) (citation and quotation omitted).
 
 E. Amicus Curiae
 
 44
 The FCC contends that the issues raised by the amicus to this case that are beyond the scope of Cellnet's arguments are not properly before this court. The FCC's contention is based on two grounds. First, it argues that an amicus may not enlarge the scope of the issues before this court. Second, it argues that this court lacks jurisdiction to consider arguments beyond the scope of the issues presented by the parties to the appeal.
 
 
 45
 The FCC argues that CONXUS has improperly enlarged the scope of this panel's review by raising issues beyond those raised by Cellnet. The FCC argues that for CONXUS to obtain review of the issues with which it is concerned, it should have filed its own petition for review, after satisfying the prerequisites for this court's review. Because CONXUS did not participate in the proceedings below nor did it seek reconsideration of the FCC's order, the FCC argues that it is precluded from obtaining judicial review of the issues it raises.
 
 
 46
 Cellnet has challenged only the sunsetting of the existing resale rule. CONXUS seeks for the resale rule to be extended to narrowband PCS licensees, whereas at present the rule only concerns, inter alia, wideband PCS licensees. CONXUS argues that it is not expanding the issues presented to this court because it is challenging the same rule that Cellnet challenges and because Cellnet also seeks a remand for reconsideration of the rule. While an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties. See, e.g., United States v. Sturm, Ruger & Co., Inc., 84 F.3d 1, 6 (1st Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 480, 136 L.Ed.2d 374 (1996); Edison Elec. Inst. v. Occupational Safety and Health Admin., 849 F.2d 611, 625 (D.C.Cir.1988). To the extent that the amicus raises issues or make arguments that exceed those properly raised by the parties, we may not consider such issues. Thus, we may not consider the resale rule vis-a-vis its impact and factors relating to narrowband PCS.[9]
 
 
 47
 Because we do not have jurisdiction to consider CONXUS's assertion that the FCC did not act reasonably in declining to impose the resale requirement on narrowband PCS licensees, we do not consider the parties' arguments regarding this issue.
 
 CONCLUSION
 
 48
 For the foregoing reasons, we DENY the petition for review.
 
 
 
 [1]
 All of the services reached by the rule adopted by the FCC order under consideration are CMRS services
 
 
 [2]
 The carriers which are subject to § 20.12(b), the section at which the new rule and its sunsetting are codified, are "providers of Broadband Personal Communications Services[,] ... providers of Cellular Telephone Service[,] ... providers of Specialized Mobile Radio Services in the 800 MHz and 900 MHz bands that hold geographic area licenses and offer real-time, two-way voice service that is interconnected with the public switched network, and incumbent Wide Area SMR licensees." 47 C.F.R. § 20.12(a) (1997). Other CMRS include local dispatch service not connected to the public network, non-private paging services, air-ground services, satellite systems for mobile communications and maritime services
 
 
 [3]
 Generally speaking, "spectrum" is the range of radio frequencies within which wireless communications providers may operate. To provide complex and technologically sophisticated services to customers, wireless providers need a larger bandwidth of frequencies
 
 
 [4]
 Without professing any technological expertise, we offer the following as an aid to our readers. Beyond the difference in digital versus analog techniques, PCS and wide-area SMR services operate similarly to cellular service. PCS and SMR operate by transmitting low power radio signals between mobile, wireless units and fixed antennae mounted on towers, buildings and other structures. Sprint, 968 F.Supp. at 1460
 
 
 [5]
 There is also mobile satellite service, a technology not at issue in this case, which is a fairly new wireless service that allows subscribers to use their mobile telephones and other communications devices via satellite. See Cincinnati Bell, 69 F.3d at 756. Mobile satellite service differs from cellular service in that its satellite rays are not blocked by terrain in the way that cellular service's land-based signals are; mobile satellite service users can communicate via mobile telephone from virtually anywhere in the world. Id
 
 
 [6]
 Subsection (b) of § 201, "Services and charges," provides that:
 All charges, practice, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.... The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.
 Subsection (a) of § 202, "Discriminations and preferences," provides that:
 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
 
 
 [7]
 Congress has directed that the FCC
 (a) ... shall forbear from applying any regulation ... to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of their geographic markets, if the Commission determines that--
 (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;
 (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and
 (3) forbearance from applying such provision or regulation is consistent with the public interest.
 (b) In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.
 47 U.S.C. § 160(a)-(b) (1996) (emphasis added).
 
 
 [8]
 Cellnet cites case law and FCC rulings in support of a standard of review for restrictions on resale which requires that alleged public detriment be direct, substantial and immediate. Such a standard applies to a carrier before the FCC, but such a standard does not govern the FCC's actions. Rather, as mentioned, we review FCC actions to determine if they are arbitrary, capricious or otherwise not in accordance with law
 
 
 [9]
 In addition, we are precluded from entertaining any additional issues raised by CONXUS by the statutory provision conferring our jurisdiction. That provision requires as a prerequisite to our review that a petitioner file a petition for reconsideration with the FCC if it was not, as CONXUS was not, a party to the proceedings before the FCC
 The filing of a petition for reconsideration shall not be a condition precedent to judicial review of [an order] except where the party seeking such review (1) was not a party to the proceedings resulting in such order....
 47 U.S.C. § 405(a)(1) (emphasis added). As CONXUS did not file a petition for reconsideration with the FCC it may not independently raise issues for our review. CONXUS argues that it is not precluded by this prerequisite because it does not acknowledge that it presents any issues in addition to those of Cellnet; it contends it is functioning solely as a proper amicus. As stated above, to the extent that CONXUS raises the same issues, it is not barred; to the extent that it raises separate issues, it is barred.